CARLA C. WOODCOCK *v.* JOURNAL PUBLISHING COMPANY, INC., ET AL.
(14894)
(14895)

PETERS, C. J., CALLAHAN, BERDON, KATZ and PALMER, Js.

Argued May 4—decision released August 2, 1994

*Richard C. Robinson,* with whom, on the brief, was *Clifford J. Grandjean,* for the appellant in the first case (defendant Green Manor Corporation).

*Wesley W. Horton* and *David F. Sherwood,* with whom were *Karen L. Murdoch* and, on the brief, *Susan M. Cormier,* and *Michael S. Taylor* and *Tanya Feliciano,* certified legal interns, for the appellants in the second case (named defendant et al.).

*William F. Gallagher,* with whom, on the brief, were *Elizabeth A. Gallagher* and *Thomas P. Barrett,* for the appellee in both cases (plaintiff).

CALLAHAN, J. The defendants in this libel action have appealed from the trial court's denial of their motions to set aside the verdict and for judgment notwithstand-

ing the verdict in favor of the plaintiff, Carla C. Woodcock. The plaintiff, a member of the South Windsor planning and zoning commission from 1987 to 1989, filed a four count libel action against the defendants. The first count of the complaint alleged that the Journal Publishing Company, Inc., the publisher of the Journal Inquirer newspaper, the Green Manor Corporation, a shareholder of the Journal Publishing Company, and Thomas Puleo, a reporter for the newspaper, had published a series of defamatory articles about the plaintiff during the years 1988 and 1989 in the Journal Inquirer. The second count alleged that the defendants had failed to disclose underlying facts known to them that would have changed the defamatory tone of the articles. The third count alleged that the Journal Publishing Company had caused further defamatory statements to be published in 1992, while the libel case was pending. The fourth count alleged that William Bellock, a developer, had made defamatory statements to employees of the Journal Inquirer that were incorporated into an article, and that he had also written a defamatory letter to the editor.

The jury found for the plaintiff concerning some, but not all, of the articles referred to in the first count of her complaint but found for the defendants on the second count. The jury also found for the plaintiff on the third and fourth counts of her complaint. The jury's verdict on the fourth count was limited to the defamatory statement attributed to Bellock in an article published in the Journal Inquirer. The jury awarded the plaintiff general damages in the amount of $245,000 against the Journal Publishing Company, $245,000 against the Green Manor Corporation, $10,000 against Puleo and $5000 against Bellock, and also awarded her special damages in the amount of $750 against the Journal Publishing Company and $750 against the Green Manor Corporation. In addition, the jury found that the

plaintiff was entitled to punitive damages, which the court later set at $121,369.77.

The trial court denied the defendants' motions to set aside the verdict and for judgment notwithstanding the verdict. The Journal Publishing Company, Puleo and Bellock filed a joint appeal, and the Green Manor Corporation filed a separate appeal, from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

In its separate appeal, the Green Manor Corporation also appealed from the trial court's denial of a motion to amend its answer to the plaintiff's complaint. In its answer, the Green Manor Corporation mistakenly admitted that it owned and operated the Journal Inquirer, when in fact it was only a stockholder in the corporation that owned the newspaper. The Green Manor Corporation filed a motion to amend its answer on February 24, 1993, at the close of the plaintiff's case, to reflect the fact that the Green Manor Corporation merely owned stock in the Journal Publishing Company but was not involved in the operation of the newspaper. The trial court denied the motion. Because we conclude that the evidence does not establish that the defendants published the articles in question with actual malice, it is unnecessary to reach the Green Manor Corporation's claims.[1]

---

[1] The Green Manor Corporation further alleged that the trial court improperly corrected the jury's verdict. The jury returned verdict damages forms, one against the Journal Publishing Company for $245,000 in general damages and $750 in special damages and another against the Green Manor Corporation for $245,000 in general damages and $750 in special damages. Both parties agreed that it was unclear whether the award was for $490,000 or $245,000. When asked by the court to clarify the verdict, the foreperson responded: "We considered Green Manor Corp. and the Journal Inquirer as being one and the same so what we did is we split the amount equally between both so the totals are $490,000 and $1500 . . . ." The trial court responded that "it should be clear that the jury intended a verdict of

The jury could reasonably have found the following facts. The plaintiff was elected to the South Windsor planning and zoning commission (commission) in November, 1987. At a public hearing on November 10, 1987, the first public hearing that the plaintiff had attended as a commission member, Bellock presented to the commissioner an application for a subdivision. At the hearing, several members of the public expressed concern that increased traffic in the area of the proposed subdivision would result if it were approved. Some opposition also was voiced against Bellock's plan to place the entrance to the subdivision on Foster Street. The commission members decided to postpone their decision on Bellock's subdivision application to obtain an opinion from the town attorney as to whether Felt Road, a potential alternative access point to the subdivision, was a town road.

The commission met again on February 2, 1988, to vote on Bellock's subdivision application, with the plaintiff and other commission members Raymond Hallowell, Louise Evans, Joel Nadel and David Sorenson in attendance. The town attorney had previously identified Felt Road as a town road. During the meeting, the plaintiff suggested modifying the subdivision site plan by placing the entrance to the subdivision on Felt Road.[2] Chairperson Hallowell indicated that in order for the plaintiff's suggestion to be considered, Bellock's

$490,000 against each corporate defendant and the court will order that the judgment should be modified or corrected to reflect that amount." The Green Manor Corporation contends that the trial court did not have authority to correct the verdict and that its only option was to order a new trial on damages.

[2] At the commission meeting, the plaintiff initiated conversation concerning the possibility of using Felt Road as an access point to the subdivision in the following manner: "There were a lot of traffic concerns that were mentioned in this area. Now that we know that through our Town Attorney Felt Road is considered a town road and we are looking at the option

application would have to be denied and Bellock would have to resubmit a modified application showing the entrance to the subdivision on Felt Road. The plaintiff thereafter moved to deny Bellock's subdivision application, which motion was seconded by commission members Nadel and Sorenson. Nadel, however, subsequently withdrew his second and refrained from voting on the plaintiff's motion because he had not attended the public hearing in November, 1987.[3]

The plaintiff's motion to deny Bellock's subdivision application was passed by the commission by a vote of three to one, with commission member Evans voting against the motion. Although commission members Hallowell and Sorenson voted to deny Bellock's subdivision application, neither one had commented favorably on the plaintiff's modification proposal. In fact, just prior to voting on the plaintiff's motion to deny Bellock's subdivision application, Hallowell and Sorenson had explained to the plaintiff that an entrance to the subdivision on Felt Road would violate commission regulations.

of opening it up, what is the possibility of using this as an entrance and exit into this land without the opening on to Foster."

The commission had returned to discussing Bellock's application for several minutes, however, and commission member Evans was about to make a motion in favor of another access point to the subdivision when the plaintiff again brought up the topic of Felt Road in the following manner: "Before you do, could I just toss out an idea that I just showed to Marcia. Flipping it around with the cul-de-sac here, the developer is going to be spending money on this amount of road so it would be maybe an extra third of more road to come in this way but possibly other land owners might be willing to share the cost of this piece of road here but coming in from here and ending up at the cul-de-sac here."

[3] Throughout the course of the February 2 commission meeting, only two commission members had expressed any approval of the plaintiff's proposal to place the entrance to the subdivision at Felt Road. Commission member Evans indicated that she "liked Carla's idea," and commission member Nadel indicated that the plan made sense in order to alleviate traffic problems. Evans subsequently voted against the plaintiff's motion to deny the subdivision application, however, and Nadel abstained from voting on the motion.

The Journal Inquirer published the first of a series of articles concerning the plaintiff on June 23, 1988. The first article alleged that the plaintiff had proposed modifying Bellock's subdivision application to the commission in order to benefit Robert Sheridan, an adjacent landowner.[4] Thomas Puleo, prior to writing that article, had discussed the circumstances surrounding the plaintiff's motion and vote with the plaintiff, her husband, Bellock, a local lawyer with zoning experience, Sheridan's attorney, commission chairperson Hallowell, and several other people. Puleo's initial source for his story was Peter DeMallie, Bellock's engineer. DeMallie provided Puleo with information concerning an alleged relationship between the plaintiff and Sheridan and between Sheridan and the plaintiff's in-laws. Puleo testified that, in writing the articles concerning the plaintiff, he had used the information that he had received from DeMallie insofar as he was able to corroborate it. Puleo also testified that, in researching the published articles, he had examined the land records relating to a mortgage transaction between Sheridan and the plaintiff's mother-in-law. In addition, he testified that he had read the minutes and had listened to the tapes of the November 10, 1987 public hearing and the February 2, 1988 meeting and had reviewed the subdivision application.

A subheadline on the first page of the June 23, 1988 edition of the Journal Inquirer, which referred the reader to a story on page twenty-two, read "Developer claims Woodcock aim to aid business associate." A further subheadline, immediately preceding the article on page twenty-two, stated "Woodcock accused of seeking changes to benefit business associate." The first paragraph of the article indicated that the plaintiff had

[4] Sheridan's property abutted Felt Road. Improvement of Felt Road would provide access to Palmer Street from Sheridan's otherwise landlocked property.

"urged the commission to alter [Bellock's] subdivision application in a way that would have provided development advantages to Robert J. Sheridan, an adjacent property owner who has had business relationships with the Woodcock family." The plaintiff claimed that the subheadlines were defamatory solely because Sheridan was not a business associate of *hers*. The plaintiff made no claim of libel with regard to the statement in the body of the article that her proposal to modify the subdivision application was spurred by a desire to benefit a business associate of the plaintiff's *family*. In fact, there was testimony at trial that Sheridan had maintained personal and business relations with the plaintiff's in-laws[5] and had played golf with the plaintiff's husband, John Woodcock III, "on occasion." In addition, Sheridan had made contributions to both the plaintiff's and her husband's campaigns for public office. Puleo conceded that the subheadlines were inaccurate but testified that he had not written the subheadlines and had never made an effort to correct them because he had not noticed the error. The jury found the subheadlines libelous and the defendants Journal Publishing Company, Green Manor Corporation and Puleo liable for their publication.

The jury also found libelous the use of the word "urged" in the June 23, 1988 article and held the Journal Publishing Company, the Green Manor Corporation and Puleo liable for its publication. The plaintiff conceded, however, that the use of the word "suggested" used subsequently in the same article was accurate. In addition, the jury found libelous a state-

---

[5] Specifically, the plaintiff's in-laws had made secured loans to Sheridan in 1978 and 1979. The plaintiff's husband had acted as his parents' attorney regarding these transactions. In addition, the insurance agency for which Sheridan worked had sold insurance to the plaintiff's father-in-law providing coverage for his refrigerator business for several years, during which time the plaintiff's husband was an officer of the business.

ment contained in the June 23 article alleging that the plaintiff was the only commission member to "back" the subdivision modification proposal.

The Journal Inquirer published a second article on June 28, 1988, concerning the bid by the plaintiff's husband for reelection as a state representative. The article reported that John Woodcock III was critical of the June 23, 1988 story and then went on to recap that article in the following manner: "Among other things, the story reported that Woodcock's wife, Planning and Zoning Commission member Carla C. Woodcock, urged the commission to alter a Manchester developer's subdivision application in a way that would have provided developmental advantages to an adjacent property owner with business ties to the family." The jury again found that the use of the word "urged" was libelous and that the Journal Publishing Company and Puleo were liable for its publication. The jury found similar uses of the word "urged" in articles published on August 4 and August 5, 1988, to be libelous. In addition, the August 4, 1988 article attributed to Bellock a statement that the plaintiff's proposal to alter the subdivision plan was an attempt to benefit Sheridan. The jury found that statement libelous and Bellock liable for its publication.

The Journal Inquirer published another article concerning the plaintiff on March 27, 1989. That article chronicled the events leading up to the plaintiff's resignation from her position as a member of the planning and zoning commission. Specifically, the article stated that the plaintiff was elected on a platform that opposed development but then, ironically, became the target of controversy involving developers and "back room deals." The jury found the use of the term "back room deals" to be libelous and the Journal Publishing Com-

pany, the Green Manor Corporation and Puleo liable for its publication.[6]

After the plaintiff had instituted suit against the defendants, the Journal Inquirer ran a story on August 27, 1992, concerning a pending motion of the plaintiff for summary judgment. The article was written by Liz Dupont, a reporter newly assigned to the Woodcock case, who had reviewed the prior articles in preparing her story. The jury found a statement contained in that article that Sheridan was a business associate of the plaintiff and her husband to be libelous and the Journal Publishing Company liable for its publication. In response to a demand by the plaintiff, however, the Journal Publishing Company retracted the statement in the August 31, 1992 issue of the Journal Inquirer.[7]

On appeal, the defendants allege, inter alia, that there was insufficient evidence that the statements for which the defendants were found liable were false and defamatory, or that they were made with actual malice. Because we conclude that the statements were not made with actual malice, we do not decide whether the statements were false and defamatory, and we do not reach the remaining issues raised by the defendants.[8]

---

[6] A statement published in an article on March 29, 1989, stating that the plaintiff became involved in "back room maneuvering" when she proposed a modification of the subdivision application to benefit a family friend was not found to be libelous.

[7] In response to a letter written by the plaintiff's husband, the editor of the Journal Inquirer stated that the newspaper would correct any errors specified to it. At no time, however, did the plaintiff request a retraction of the articles written in 1988 and 1989. She did write a letter, which was published by the Journal Inquirer on July 12, 1988, in which she denied any conflict of interest concerning the subdivision application and asserted that the statements in the previous articles were untrue. She never specified, however, the statements to which she referred.

[8] The defendants also allege that: (1) an absolute privilege exists for opinion under article first, §§ 4 and 5, of the Connecticut constitution; (2) the plaintiff must prove falsity by clear and convincing evidence; (3) the ver-

Under the first amendment to the United States constitution, a public official,[9] in order to recover damages for a defamatory falsehood relating to his or her official conduct, must prove that the statement was made with actual malice. *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964); see also *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 14, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990); *Harte-Hankes Communications, Inc. v. Connaughton,* 491 U.S. 657, 659, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989); *Brown v. K.N.D. Corp.,* 205 Conn. 8, 10, 529 A.2d 1292 (1987). Actual malice requires that the statement, when made, be made with actual knowledge that it was false or with reckless disregard of whether it was false. *New York Times Co. v. Sullivan,* supra, 279–80; see also *Milkovich v. Lorain Journal Co.,* supra, 14; *Harte-Hanks Communications, Inc. v. Connaughton,* supra, 659. Moreover, a public official must prove actual malice by clear and convincing evidence in order to prevail in a defamation action. *Milkovich v. Lorain Journal Co.,* supra, 14; *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 773, 106 S. Ct. 1558, 89 L. Ed. 2d 783 (1986); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974); *Brown v. K.N.D. Corp.,* supra, 10.

"[T]he clearly erroneous standard of Rule 52 (a) of the Federal Rules of Civil Procedure does not prescribe the standard of review to be applied in reviewing a

dict was excessive; and (4) the jury's confusion as to the relationship between the Journal Publishing Company and the Green Manor Corporation in awarding damages requires a new trial. In addition, the defendants challenge several evidentiary rulings made by the trial court.

[9] The plaintiff does not contest that, as a member of the planning and zoning commission, she was a public official as contemplated by *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S. Ct. 728, 11 L. Ed. 2d 686 (1964), *Rosenblatt v. Baer,* 383 U.S. 75, 86 S. Ct. 669, 15 L. Ed. 2d 597 (1966), and *Moriarty v. Lippe,* 162 Conn. 371, 294 A.2d 326 (1972).

determination of actual malice in a case governed by *New York Times Co.* v. *Sullivan* [supra, 376 U.S. 254]." *Bose Corp.* v. *Consumers Union of United States, Inc.,* 466 U.S. 485, 514, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984). In reviewing defamation actions, " 'an appellate court has an obligation to "make an independent examination of the whole record" in order to make sure that "the judgment does not constitute a forbidden intrusion on the field of free expression." *New York Times Co.* v. *Sullivan,* [supra, 284-86].' " *Brown* v. *K.N.D. Corp.,* supra, 205 Conn. 11, quoting *Bose Corp.* v. *Consumers Union of United States, Inc.,* supra, 499; *Tavoulareas* v. *Piro,* 817 F.2d 762 (D.C. Cir. 1987), cert. denied, 484 U.S. 870, 108 S. Ct. 200, 98 L. Ed. 2d 151 (1987); *Holbrook* v. *Casazza,* 204 Conn. 336, 343, 528 A.2d 774 (1987), cert. denied, 484 U.S. 1006, 108 S. Ct. 699, 98 L. Ed. 2d 651 (1988). Because "freedom of expression occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection . . . *NAACP* v. *Claiborne Hardware Co.,* 458 U.S. 886, 913, 102 S. Ct. 3409, 73 L. Ed. 2d 1215 (1982)"; (internal quotation marks omitted) *Brown* v. *K.N.D. Corp.,* supra, 11; "[t]he rule of independent review assigns to appellate courts in first amendment freedom of expression cases, a constitutional responsibility that cannot be delegated to the trier of fact, whether the factfinding function be performed in the particular case by a jury or by a trial judge. *Bose Corporation* v. *Consumers Union of United States, Inc.,* supra, 501." (Internal quotation marks omitted.) Id.

After conducting an independent review of the record, we are not persuaded that the evidence presented demonstrates actual malice with the convincing clarity that the constitutional standard requires. In so concluding, we recognize that the concepts of "actual mal-

ice" and "reckless disregard" are "not readily captured in 'one infallible definition.' *St. Amant* v. *Thompson,* [390 U.S. 727, 730, 88 S. Ct. 1323, 20 L. Ed. 2d 262 (1968)]. Rather, only through the course of case-by-case adjudication can we give content to these otherwise elusive constitutional standards. [*Bose Corp.* v. *Consumers Union of United States, Inc.,* supra, 466 U.S. 503]." *Harte-Hanks Communications, Inc.* v. *Connaughton,* supra, 491 U.S. 686. The United States Supreme Court has indicated that, at a minimum, actual malice requires that there "be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant* v. *Thompson,* supra, 731.

The jury found the subheadlines in the Journal Inquirer stating that the plaintiff and Sheridan were business associates to be libelous. Although Puleo admitted that the statements were inaccurate, he also testified that he had not written the subheadlines and had failed to notice the inaccuracy. Susan Sarvay, the editor of the June 23, 1988 article, also testified that she had neither written the headlines nor noticed that they were inaccurate at the time the story was printed. Sarvay indicated that the author of the subheadlines would normally have read a few paragraphs of the story prior to preparing them. Puleo testified that the author of the subheadlines could conclude that they were accurate because of the reference in the story to Sheridan's business connections with the Woodcock family, not challenged by the plaintiff as libelous. Because the record fails to reveal anything that would have caused the author of the subheadlines to "[entertain] serious doubts as to the truth of [the subheadlines]"; *St. Amant* v. *Thompson,* supra, 390 U.S. 731; we cannot say that it has been demonstrated with con-

vincing clarity that the subheadlines were prepared or printed with actual malice.

The most that can be said of the inaccurate subheadlines is that the defendants were negligent in their preparation and publication. This court has stated, however, that a "merely negligent misstatement of fact about a public official retains the constitutional protection afforded free expression." *Holbrook* v. *Casazza,* supra, 204 Conn. 346; *Rosenbloom* v. *Metromedia,* 403 U.S. 29, 50, 91 S. Ct. 1811, 29 L. Ed. 2d 296 (1971); *Rosenblatt* v. *Baer,* 383 U.S. 75, 83–84, 86 S. Ct. 669, 15 L. Ed. 2d 597 (1966). As a result, the negligently prepared subheadlines do not support a finding of actual malice by clear and convincing evidence.

The jury also found that the use of the word "urged" in several articles was defamatory. The articles stated that the plaintiff had "urged" the commission to modify Bellock's subdivision application in a way that would benefit Sheridan. The plaintiff concedes, however, that the use of the word "suggested" in one of the articles was accurate. The demarcation between the terms "urged" and "suggested" is not capable of sustaining a finding of actual malice. Where the language chosen is " 'one of a number of possible rational interpretations' of an event 'that bristled with ambiguities' and descriptive challenges for the writer . . . [t]he choice of such language, though reflecting a misconception, does not place the speech beyond the outer limits of the First Amendment's broad protective umbrella." (Citation omitted; internal quotation marks omitted.) *Bose Corp.* v. *Consumers Union of United States, Inc.,* supra, 466 U.S. 512–13.

Prior to writing the articles in question, Puleo had spoken to Marcia Banach, the town planner of South Windsor, who had been present at the February 2, 1988 meeting of the commission. Banach testified that she

had indicated to Puleo that the plaintiff had "pressed really hard" for the subdivision modification. Given the ambiguities of the circumstances surrounding the plaintiff's subdivision modification proposal at the commission meeting, the defendants were not reckless in choosing, from among several conceivable interpretations, the one that they did choose, even if it was offensive to the plaintiff. See L. Tribe, American Constitutional Law (2d Ed. 1988) § 12-12, p. 870, citing *Time, Inc.* v. *Pape*, 401 U.S. 279, 290, 91 S. Ct. 633, 28 L. Ed. 2d 45 (1971). We conclude that the difference between "suggesting" a proposal and "urging" a proposal "fits easily within the breathing space that gives life to the First Amendment." *Bose Corp.* v. *Consumers Union of United States, Inc.,* supra, 466 U.S. 513.

We similarly conclude that the statement contained in the June 23, 1988 article alleging that the plaintiff was the only member of the commission to "back" the modification proposal was not proven by clear and convincing evidence to have been made with actual malice. In researching the article at issue, Puleo listened to the tapes and read the minutes of the November 10, 1987 public hearing and the February 2, 1988 commission meeting. The only two commission members to comment favorably on the plaintiff's proposal, Nadel and Evans, either abstained from voting or voted against the motion to deny Bellock's subdivision application. The two commission members who voted with the plaintiff to deny the subdivision application, Hallowell and Sorrenson, did not necessarily agree with the modification proposal. In fact, Hallowell and Sorenson participated in a discussion with Woodcock prior to voting on the motion to deny the subdivision application wherein they indicated that the subdivision as modified would violate commission regulations. Nadel testified that he would not describe his position on the

plaintiff's modification proposal as "backing" the proposal.[10] As Nadel's testimony made clear, the situation "bristled with ambiguities" and could not readily be described in any definitive way. See *Bose Corp.* v. *Consumers Union of United States, Inc.*, supra, 466 U.S. 512. We conclude that Puleo's observation that the plaintiff was the only commission member to back the proposal is one of a number of rational interpretations of an ambiguous event and, as such, the evidence fails to prove with convincing clarity that the defendants acted with a "high degree of awareness of . . . probable falsity, *Garrison* v. *Louisiana*, 379 U.S. 64, 74, 85 S. Ct. 209, 13 L. Ed. 2d 125 (1964), or . . . entertained serious doubts as to the truth of [the] publication, [*St. Amant* v. *Thompson*, supra, 390 U.S. 731]." (Internal quotation marks omitted.) *Harte-Hanks Communications, Inc.* v. *Connaughton*, supra, 491 U.S. 667.

Similarly, because the circumstances surrounding the plaintiff's subdivision modification proposal "bristled with ambiguities"; see *Bose Corp.* v. *Consumers Union of United States, Inc.*, supra, 466 U.S. 512–13; we cannot say that the statement that the plaintiff was engaged in "back room deals" was proven by clear and convincing evidence to have been made with actual malice.[11] The jury did not find a subsequent statement that the plaintiff was involved in "back room maneuvering"

---

[10] At trial, the following colloquy occurred:

"[Dominic Squatrito, defendant's counsel:] Did you back the building of the road from Felt—from Palmer Drive up through Felt into the subject matter property . . . ?

"[Joel Nadel:] Sir, I don't know what you mean by the use of the word 'back.' I thought the idea was a good one and it was deserving of further discussion. I don't believe I ever used the word 'back,' and I'm not certain that I understand how you're using that word."

[11] We question whether the term "back room deals" is libelous at all. See, e.g., *Greenbelt Cooperative Publishing Assn.* v. *Bresler*, 398 U.S. 6, 13–14, 90 S. Ct. 1537, 26 L. Ed. 2d 6 (1969) (word "blackmail" is not libelous but merely rhetorical hyperbole). Because we conclude that the statements were not made with actual malice, however, we need not decide this question.

to be libelous. The two terms, however, have nearly identical implications and could be used interchangeably in a sentence without altering its meaning. "[T]he First Amendment cautions courts against intruding too closely into questions of editorial judgment, such as the choice of specific words." *Janklow* v. *Newsweek, Inc.*, 788 F.2d 1300, 1304 (8th Cir.), cert. denied, 479 U.S. 883, 107 S. Ct. 272, 93 L. Ed. 2d 249 (1986). We conclude that the term "back room deals" was one rational interpretation of the situation as contemplated by *Bose Corp.* and does not support a finding of actual malice.

The jury further found libelous and malicious a statement made by Bellock, and reported in the August 4, 1988 edition of the Journal Inquirer that the plaintiff's subdivision modification proposal was an attempt to benefit Sheridan. We disagree that there was sufficient evidence to support such a finding. Although the plaintiff claims that she was not trying to aid anyone in voting against the subdivision application, she conceded that she had known that Sheridan's land abutted Felt Road, which was undeveloped, and that her proposal to alter the subdivision plan would have given Sheridan access to Palmer Street from his otherwise landlocked property. She also testified that she had known that her modification proposal would have increased the cost of construction to the developer and decreased the number of lots. The plaintiff further testified that she had known that the subdivision modification proposal would have benefited Sheridan. Thus the defamatory nature of the sentence arises solely from the allegation that the plaintiff was *attempting* to benefit Sheridan. The jury did not find libelous, however, a remarkably similar statement that accused the plaintiff of *trying* to help a friend at the expense of the subdivision application. We fail to see any significant difference in the import of the two statements. We conclude that the plaintiff's

proposal of the subdivision modification, whether or not actually motivated by a desire to benefit Sheridan, was capable of being rationally interpreted by Bellock as being motivated by a desire to benefit Sheridan. See *Bose Corp.* v. *Consumers Union of United States, Inc.,* supra, 466 U.S. 512–13. As such, the evidence fails to demonstrate with convincing clarity that Bellock "entertained serious doubts as to the truth of his [statement]."[12] *St. Amant* v. *Thompson,* supra, 390 U.S. 731.

Finally, the jury found libelous and malicious a statement contained in an August 27, 1992 article alleging that the plaintiff and her husband were business associates of Sheridan. The defendants have conceded that the statement was incorrect. We do not agree, however, that the statement was made with actual malice—that is, with knowledge of its falsity or with reckless disregard of its truth or falsity. See *Holbrook* v. *Casazza,* supra, 204 Conn. 346. Liz Dupont, a writer new to the Woodcock case, and not Puleo, wrote the article. In researching her story, she reviewed prior articles, two of which contained statements that were found not to be libelous indicating that Sheridan had "business and personal ties to the Woodcocks." Dupont was justified in concluding, even if that conclusion was erroneous, that Sheridan had a connection to the Woodcocks. At trial, the plaintiff did not call the editor of the newspaper to testify as to whether he or she had been aware of the inaccuracy at the time the article was published. In the absence of evidence to the con-

---

[12] Nor can Bellock be said to have acted with actual malice for failing to investigate the matter prior to making the statement about the plaintiff to the Journal Inquirer. The United States Supreme Court has made clear that "reckless conduct is not measured by whether a reasonably prudent man . . . would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubt as to the truth of his publication." *St. Amant* v. *Thompson,* supra, 390 U.S. 731.

trary, the most that can be said is that the defendants were negligent in researching and publishing the article. As stated previously, "[a] merely negligent misstatement of fact about a public official retains the constitutional protection afforded free expression." *Holbrook* v. *Casazza,* supra, 346.

Furthermore, on August 31, 1992, the Journal Inquirer published a retraction of the statement that Sheridan had business and personal ties to the Woodcocks. We have stated that a refusal to retract a statement that has been demonstrated to be false and defamatory may be relevant in proving a reckless disregard for the truth. Id., 349. In the present case, however, the fact that the newspaper retracted the statement is indicative of its concern for relaying accurate and truthful information. See *Gulf Publishing Co.* v. *Lee,* 434 So. 2d 687 (Miss. 1983) (evidence that defendant took every reasonable step to correct any error in article, including issuing retraction, supports finding of no actual malice). As such, we cannot say that the record demonstrates by clear and convincing evidence that the defendants acted with actual malice in publishing Dupont's story.

The gist of the plaintiff's argument in support of her contention that the defendants acted with actual malice in publishing the allegedly defamatory articles is that the defendants were deliberately attempting to harm her husband's campaign for the state legislature. She notes that "Puleo . . . knew that a critical article about John Woodcock's wife would have some effect on Woodcock's campaign for the legislature in 1988." She cites the fact that Puleo had authored negative articles about her husband on two previous occasions. In further support of this theory, the plaintiff alleges that Bellock had not thought about complaining about her conduct regarding his subdivision application until after Puleo had raised questions with him about the plain-

tiff's motives in proposing the subdivision modification. However, "proof that a defamatory falsehood has been uttered 'with bad or corrupt motive' or with an intent to inflict harm will not be sufficient to support a finding of actual malice; *Beckley Newspapers Corporation* v. *Hanks,* [389 U.S. 81, 82–83, 88 S. Ct. 197, 19 L. Ed. 2d 248 (1967)]; *Henry* v. *Collins,* 380 U.S. 356, 357, 85 S. Ct. 992, 13 L. Ed. 2d 892 (1965); although such evidence may assist in drawing an inference of knowledge or reckless disregard of falsity. 3 Restatement (Second), Torts § 580A, comment d." *Holbrook* v. *Casazza,* supra, 204 Conn. 346–47. "[E]vidence of ill will or bad motives will support a finding of actual malice only when combined with other, more substantial evidence of a defendant's bad faith." *Tavoulareas* v. *Piro,* supra, 817 F.2d 795.

In *Holbrook* v. *Casazza,* supra, 204 Conn. 348–49, this court affirmed a finding of actual malice where evidence of ill will in accusing a public official of misconduct was corroborated by the defendant's failure: (1) to read the statutes with which she charged the official in question of having violated; (2) to investigate the facts; (3) to seek advice from other knowledgeable persons; and (4) to publish a retraction after learning that the official was exonerated. Similarly, in *Harte-Hanks Communications, Inc.* v. *Connaughton,* supra, 491 U.S. 691–92, the United States Supreme Court found actual malice in the publisher's failure to consult a key witness and in its failure to listen to a readily available tape recording of a conversation in question in order to verify an informant's "highly improbable" charges, on which five other witnesses had cast serious doubt. In contrast to *Holbrook* and *Harte-Hanks Communications, Inc.,* our review of the record in the present case fails to reveal substantial evidence of the defendants' "purposeful avoidance of the truth"; id., 692; suf-

ficient to support a finding of actual malice by clear and convincing evidence.

The plaintiff summarily concludes that because the "defendants made no attempt to determine the truth," she has sustained her burden of proving actual malice by clear and convincing evidence. The defendants did not, however, make "no attempt to determine the truth." The evidence demonstrates that, prior to writing the articles in question, Puleo had interviewed available sources, had thoroughly reviewed the tapes and the minutes of both the November 10, 1987 public hearing and the February 2, 1988 commission meeting, had reviewed the subdivision application and had researched the land records. The plaintiff also implies that because DeMallie, the source of Puleo's information, had a financial interest in Bellock's subdivision, Puleo acted with actual malice in crediting the information. Puleo, however, reported only the information from DeMallie for which Puleo was able to find substantial corroboration. See *Tavoulareas* v. *Piro,* supra, 817 F.2d 792–93 ("the evidence of personal animus between [the informant and the plaintiff] was not indicative of the defendants' actual malice in view of their independent corroboration of [the] information").

Even if we were to agree that the defendants had made an insufficient attempt to determine the truth prior to publishing the articles in question, a failure to undertake an adequate investigation is not dispositive of the issue of actual malice. *St. Amant* v. *Thompson,* supra, 390 U.S. 727, wherein the United States Supreme Court reversed a jury finding of liability in a defamation action brought by a public official, is illustrative of the plaintiff's heavy burden in satisfying the actual malice standard. In *St. Amant,* the defendant repeated false allegations that the plaintiff had taken bribes from a local teamsters union president. The defendant's source of information was an active mem-

ber of a dissident faction within the union that was involved in a struggle for control of the union against another faction led by the teamster's official alleged to have paid a bribe to the plaintiff. Id., 733. Even though the defendant failed to make an independent investigation of the charge of bribery and failed to seek confirmation of the information from others who might have known the facts, the United States Supreme Court stated that "[t]hese considerations fall short of proving [the defendant's] reckless disregard for the accuracy of his statements . . . ." Id., 730. The court made clear that "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." Id., 731.

In sum, we are not convinced that the evidence demonstrates with the requisite convincing clarity that the defendants entertained serious doubts as to the truth of their publication, particularly in light of the fact that they offered to correct any errors specified by the plaintiff or her husband. While the defendants' articles adopted a somewhat adversarial stance toward the plaintiff, "[a]n adversarial stance is certainly not indicative of actual malice under the circumstances where, as here, the reporter conducted a detailed investigation"; *Tavoulareas* v. *Piro,* supra, 817 F.2d 795–96; and adopted one rational interpretation of an ambiguous situation. See *Bose Corp.* v. *Consumers Union of United States, Inc.,* supra, 466 U.S. 512–13.

We conclude that the record fails to demonstrate, by clear and convincing evidence, that the defendants acted with actual malice. In arriving at our conclusion, we appreciate that the burden of proof placed on the plaintiff is a difficult one. We recognize, however, that the " 'debate on public issues should be uninhibited,

robust and wide-open, and that [such debate] may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.' *New York Times Co.* v. *Sullivan,* supra, [376 U.S.] 270. It must be kept in mind that '[c]riticism of those responsible for government operations must be free, lest criticism of government itself be penalized.' *Rosenblatt* v. *Bauer,* [supra, 383 U.S. 85]." *Brown* v. *K.N.D. Corp.,* supra, 205 Conn. 16.

The judgment is reversed and the case is remanded to the trial court with direction to render judgment in favor of the defendants.

In this opinion PETERS, C. J., and KATZ and PALMER, Js., concurred.

BERDON, J., concurring. The majority's opinion that, as a matter of law, the plaintiff failed to meet her burden of proving actual malice by clear and convincing evidence is thoughtful and well reasoned. I write separately only because I would not have reached that issue. Instead, I would have held that the statements in the articles published in the Journal Inquirer for which the jury imposed liability were not libelous as a matter of law. Such a holding would allow litigation such as this to be disposed of in the early stages by way of summary judgment. Because this would have a significant, beneficial impact on the protection of first amendment rights, I furnish this separate analysis.

This libel case implicates the significant constitutional right of freedom of the press. At the time that the articles were published about her in the Journal Inquirer, the plaintiff, Carla C. Woodcock, was a public official, and the contents of the articles were of public concern. That public concern was the plaintiff's proposal, as a member of the planning and zoning commission of the

town of South Windsor, of a change in a subdivision application that would have benefited a business associate of her family.

The articles published in the Journal Inquirer involved the type of expression—criticism of the official conduct of a public official—that is at the very core of first amendment freedoms. As Justice Brennan wrote in *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 270, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964), our country has "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." The founding fathers of our country believed that public discussion was essential to a democratic form of government. Id., 269–70. That is why it "is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions . . . and this opportunity is to be afforded for vigorous advocacy no less than abstract discussion." (Citation omitted; internal quotation marks omitted.) Id., 269.

In a society with such a deep commitment to a free press enshrined in both our federal and state constitutions,[1] a public official—whether a member of a commission, a mayor, a governor, a legislator or even a judge—must expect that he or she will at times be subject to public criticism. That criticism will come sometimes in the form of rhetorical hyperbole, and

---

[1] The first amendment to the United States constitution provides in relevant part: "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ."

The Connecticut constitution contains two provisions concerning freedom of speech and of the press. Article first, § 4, provides: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty." Article first, § 5, provides: "No law shall ever be passed to curtail or restrain the liberty of speech or of the press."

sometimes in the form of not very accurate reporting. It may carry the harsh sting of a vitriolic pen and have a significant impact on the public official. While such criticism can be hard on public officials, it is simply the price that must be paid in order to protect our democracy. And public officials are not without recourse: they have greater access than private persons to the public forum, through which they may vindicate themselves.

In their concurring opinions in *New York Times Co.* v. *Sullivan,* supra, 376 U.S. 254, Justices Black, Douglas and Goldberg, in order to protect more fully first amendment rights, urged that the court adopt an absolute constitutional privilege for the discussion of public affairs. Justice Black wrote as follows: "This Nation of ours elects many of its important officials; so do the States, the municipalities, the counties, and even many precincts. These officials are responsible to the people for the way they perform their duties. While our Court has held that some kinds of speech and writings, such as 'obscenity' . . . and 'fighting words' . . . are not expression within the protection of the First Amendment, freedom to discuss public affairs and public officials is unquestionably, as the Court today holds, the kind of speech the First Amendment was primarily designed to keep within the area of free discussion. To punish the exercise of this right to discuss public affairs or to penalize it through libel judgments is to abridge or shut off discussion of the very kind most needed. This Nation, I suspect, can live in peace without libel suits based on public discussions of public affairs and public officials. But I doubt that a country can live in freedom where its people can be made to suffer physically or financially for criticizing their government, its actions, or its officials. 'For a representative democracy ceases to exist the moment that

the public functionaries are by any means absolved from their responsibility to their constituents; and this happens whenever the constituent can be restrained in any manner from speaking, writing, or publishing his opinions upon any public measure, or upon the conduct of those who may advise or execute it.' An unconditional right to say what one pleases about public affairs is what I consider to be the minimum guarantee of the First Amendment." (Citations omitted.) Id., 296–97 (Black, J., concurring).

Although the majority of the court in the *New York Times Co.* case rejected this absolute privilege, they did adopt the "rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." Id., 279–80. Our finding in this case that there is no actual malice as a matter of law requires a reversal of the judgment and a directed verdict in favor of the defendants. This relieves the defendants from having to pay a judgment of $382,119.77.

Nevertheless, when a libel case is groundless, as I believe this case is, the press, even if ultimately victorious, can still be the loser. The cost of the legal fees alone can be staggering and can have a dampening effect on our right to know. "There is significant empirical data to suggest that the costs of defending defamation litigation have caused newspapers to soften or abandon coverage of controversial issues. 'Whether a suit is settled, won, or lost, the legal fees alone can be chilling.' R. Smolla, 'Let the Author Beware: The Rejuvenation of the American Laws of Libel,' 132 U. Pa. L. Rev. 1, 13 (1983). 'The desultory pace of this . . . litigation gives little comfort to those who would

assert their constitutional right to free speech about public affairs. This is especially true of the many smaller journals and local newspapers which have played an important role in the affairs of [a state] but which cannot withstand high litigation costs.' *Maressa* v. *New Jersey Monthly*, 89 N.J. 176, 196, 445 A.2d 376 (1982). The public loses in such circumstances; it results in self-censorship by the press to avoid incurring substantial fees especially by those small newspapers who cannot bear the costs. Note, 'Media Counteractions: Restoring the Balance to Modern Libel Law,' 75 Geo. L.J. 315 (1986). An intimidated press is a threat to our democracy." *Dow* v. *New Haven Independent, Inc.*, 41 Conn. Sup. 31, 46–47, 549 A.2d 683 (1987).

While the actual malice standard is an important protection for critics of official conduct, it has had the unintended consequence of increasing the costs of libel litigation. Because a public official may demonstrate actual malice by proving that the defendant made the statement at issue with reckless disregard of whether it was true or not, the actual malice standard has generated a tidal wave of discovery requests concerning the editorial process. A. Lewis, Make No Law (1992) pp. 201–202.[2] Although the United States Supreme Court has recognized that such discovery can place heavy financial burdens on the press, it has refused to limit inquiry into the editorial process in cases where actual malice is at issue. See *Herbert* v. *Lando*, 441 U.S. 153, 175–77, 99 S. Ct. 1635, 60 L. Ed. 2d 115 (1979). The *Herbert* court stated that, because of the actual malice standard, "the plaintiff must focus on the editorial process and prove a false publication attended by some degree of culpability on the part of the pub-

---

[2] Journalists resist such requests, in part because of the costs, and in part because "[e]ditors and reporters deeply resent intrusion into the editorial process by outsiders, not least by lawyers." A. Lewis, supra, p. 201.

lisher. If plaintiffs in consequence now resort to more discovery, it would not be surprising; and it would follow that the costs and other burdens of this kind of litigation would escalate and become much more troublesome for both plaintiffs and defendants. It is suggested that the press needs constitutional protection from these burdens if it is to perform its task, which is indispensable in a system such as ours. . . . [F]oreclosing direct inquiry into the editorial process, however, would not cure this problem for the press. Only complete immunity from liability for defamation would effect this result . . . ." Id., 176.[3]

The resulting fees incurred for legal proceedings prior to trial can be staggering. Four years before the lawsuit in *Herbert* was finally dismissed; see *Herbert v. Lando*, 781 F.2d 298 (2d Cir.), cert. denied, 476 U.S. 1182, 106 S. Ct. 2916, 91 L. Ed. 2d 545 (1986); journalist Mike Wallace, who was a defendant in the suit, estimated that the defendant Columbia Broadcasting System (CBS) had already spent between $3 million and $4 million on attorney's fees alone. A. Lewis, supra, p. 202. Although in the present case I am sure the legal fees incurred in defending the libel suit will not approach the amount incurred by CBS in the *Herbert* litigation, even modest legal costs can deter free public discussion, especially by small independent newspapers and other media who seek to criticize the government and public officials. The record in the present case does not indicate the amount of legal fees that each of the defendants incurred. Nevertheless, their magnitude can be gleaned from fact that the trial court awarded the plaintiff $110,000 in attorney's fees

---

[3] Although he dissented in *Herbert* v. *Lando*, supra, 441 U.S. 180, even Justice Brennan thought it would be "anomalous" to require the plaintiff to prove the defendant's state of mind while allowing the defendant to refuse to disclose evidence of that state of mind. Id., 192 (Brennan, J., dissenting).

as punitive damages, in accordance with the jury's determination that such damages were merited.[4]

Because litigation costs can chill speech, and because the actual malice standard generates costly and lengthy legal proceedings, including extensive discovery, I think it is important, in order to set standards for future cases, to point out that the articles at issue in this case are not libelous under our law. If an article or other publication is not libelous as a matter of law, a plaintiff's claim may be disposed of through summary judgment without proceeding through our complex legal process and generating reams of discovery concerning the defendant's state of mind. *Strada* v. *Connecticut Newspapers, Inc.,* 193 Conn. 313, 316 n.4, 477 A.2d 1005 (1984); see also *Charles Parker Co.* v. *Silver City Crystal Co.,* 142 Conn. 605, 612, 116 A.2d 440 (1955) ("if the alleged defamatory words could not reasonably be considered defamatory in any sense, the matter becomes an issue of law for the court").

When the statements for which the jury imposed liability are analyzed within the context of our established law, it is clear that they are not libelous. "A defamation action is based on the unprivileged communication of a false statement that tends either to harm the reputation of another by lowering him or her in the estimation of the community or to deter others from dealing or associating with him or her." 1 D. Pope, Connecticut Actions and Remedies: Tort Law (1993) § 10:03, p. 10-10. A public official, at least in regard to media defendants, bears the burden of proving that

---

[4] The trial court files in this case measure eight inches thick and contain, according to the docket sheet, 147 pleadings, motions, notices, memoranda of decision and other items. The trial of this matter, exclusive of jury selection, took a total of fifteen days between February 2 and March 9, 1993. The $110,000 in attorney's fees that were awarded as part of the punitive damages award do not even reflect the costs of this appeal.

the statement complained of was false in some material respect. *Milkovich* v. *Lorain Journal Co.,* 497 U.S. 1, 16, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990); *Philadelphia Newspapers, Inc.* v. *Hepps,* 475 U.S. 767, 776, 106 S. Ct. 1558, 89 L. Ed. 2d 783 (1986).

In analyzing the question of falsity, a "statement is not considered false [even though it is not technically true] unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." (Internal quotation marks omitted.) *Masson* v. *New Yorker Magazine, Inc.,* 501 U.S. 496, 517, 111 S. Ct. 2419, 115 L. Ed. 2d 447 (1991); see also *Strada* v. *Connecticut Newspapers, Inc.,* supra, 193 Conn. 322; *Goodrich* v. *Waterbury Republican-American, Inc.,* 188 Conn. 107, 113, 438 A.2d 1317 (1982). A defendant will not be held liable as long as the statements at issue are substantially true. *Masson* v. *New Yorker Magazine, Inc.,* supra, 516; *Strada* v. *Connecticut Newspapers, Inc.,* supra, 321–22; *Goodrich* v. *Waterbury Republican-American, Inc.,* supra, 113. "Where the 'main charge, or gist, of the libel' is true, minor errors that do not change a reader's perception of the statement do not make the statement actionable. *Goodrich* v. *Waterbury Republican-American, Inc.,* supra, 113." *Strada* v. *Connecticut Newspapers, Inc.,* supra, 322.

Particular words or statements must be viewed not in isolation, but in terms of the context of the entire communication. See *Yavis* v. *Sullivan,* 137 Conn. 253, 260, 76 A.2d 99 (1950). Inaccurate headlines are not libelous if they are correctly clarified by the text of an article. See *Contemporary Mission, Inc.* v. *New York Times Co.,* 842 F.2d 612, 624–25 (2d Cir.), cert. denied sub nom. *O'Reilly* v. *New York Times Co.,* 488 U.S. 856, 109 S. Ct. 145, 102 L. Ed. 2d 117 (1988). Likewise, a characterization that is obviously, from the context of

the article, meant as rhetorical hyperbole cannot be the basis for liability. *Greenbelt Cooperative Publishing Assn.* v. *Bresler,* 398 U.S. 6, 14, 90 S. Ct. 1537, 26 L. Ed. 2d 6 (1970). Finally, as we pointed out in *Strada* v. *Connecticut Newspapers, Inc.,* supra, 193 Conn. 323, the "goal of nurturing a free and active press in the political arena mandates denial of recovery by a public figure where the allegation of defamation depends fundamentally on an interpretation of various aspects of the broadcast, not on anything directly said in it." (Internal quotation marks omitted.)

Applying these principles to the five statements at issue[5] in this appeal, it is clear that they are not libelous. The first statement encompasses the two subheadlines in the June 23, 1988 article. The plaintiff claims that these subheadlines were libelous because they indicated that Sheridan, the developer who would have been benefited by her proposal, was her business associate, whereas in truth he was a business associate of other members of her family. I disagree. This inaccuracy was clarified in the first paragraph of the accompanying article, which stated that Sheridan "had business relationships with the Woodcock family." The plaintiff did not dispute the truth of this statement. Therefore, although the subheadlines slightly mischaracterized the connection between the plaintiff and Sheridan, I would hold that they were not libelous as a matter of law in view of the accompanying clarification. In *Contemporary Mission, Inc.* v. *New York Times Co.,* supra, 842 F.2d 624, a subheadline falsely stated that certain priests' ordinations had been called forged, when in truth it was the documentation supporting the ordinations that had been called forged. The court held: "[W]e do not think that, in context, the statement was

---

[5] I do not discuss the allegedly libelous statement that the plaintiff attempted to benefit Sheridan because it did not involve the newspaper.

defamatory. We agree that the subhead somewhat mischaracterizes the controversy surrounding the ordinations, since it was the documents supporting the ordinations and not the ordinations themselves that were called forged. But, the statement is immediately followed by text that clarifies that the priests were indeed ordained and that the allegations of forgery related to the documents submitted in support of the ordinations and not the ordinations themselves." Id., 625.

Furthermore, the absolute truth—that Sheridan was a business associate of other members of the plaintiff's family, rather than of the plaintiff herself—would have had the same effect on the reader as the inaccurate subheadlines. Either way, the reader would have perceived that the plaintiff had had a conflict of interest. Therefore, the inaccurate subheadlines were not libelous. See *Masson* v. *New Yorker Magazine, Inc.,* supra, 501 U.S. 517; *Strada* v. *Connecticut Newspapers, Inc.,* supra, 193 Conn. 322; *Goodrich* v. *Waterbury Republican-American, Inc.,* supra, 188 Conn. 113 ("[t]he issue is whether the libel, as published, would have a different effect on the reader than the pleaded truth would have produced").

The second alleged libel is the language in four different articles that the plaintiff had "urged" the commission to change the subdivision proposal in a way that would have benefited Sheridan. The plaintiff admitted that she had "suggested" that the commission change the proposal. Within the context of libel law involving first amendment rights, the difference between "urged" and "suggested" is wholly insignificant. See *Meeropol* v. *Nizer,* 381 F. Sup. 29, 35 (S.D.N.Y. 1974), aff'd, 560 F.2d 1061 (2d Cir. 1977), cert. denied, 434 U.S. 1013, 98 S. Ct. 727, 54 L. Ed. 2d 756 (1978) ("[A]ny deviations from or embellishments upon the

'information obtained from the primary sources relied upon were minuscule and can be attributed to the leeway afforded an author who attempts to recount and popularize an historic event." [Internal quotation marks omitted.]).

Furthermore, the plaintiff made her proposal initially, and then subsequently, while another commission member was speaking, she interrupted that member to speak supportively of her proposal. The town planner felt that the plaintiff had "pressed really hard" for her proposal. Because this statement was at worst a mere embellishment upon the truth, I would hold that the use of the word "urged" did not constitute libel.

The third statement is the claim that the plaintiff "was the only commission member to back" the proposal. Two other members spoke favorably concerning the proposal but did not vote in favor of denying the original subdivision application. Two others voted to deny the subdivision application, but had been silent concerning the plaintiff's alternative proposal. Therefore, the plaintiff was the only person who both spoke in favor of the proposal at the hearing and voted consistently with it. If "to back" is given its ordinary meaning of "to support"; see Webster's Tenth New Collegiate Dictionary (1993); then the statement is completely true. The plaintiff was the only person who clearly supported the proposal throughout the hearing.

The fourth libel found by the jury—the statement that the plaintiff was engaged in "back room deals"—is not libelous, especially in view of the fact that the plaintiff did not challenge the accuracy of the remainder of the article. In *Strada* v. *Connecticut Newspapers, Inc.,* supra, 193 Conn. 321, we recognized that "[a] fussy insistence upon literal accuracy would condemn the press to an arid, dessicated recital of bare facts." (Internal quotation marks omitted.) Moreover, the United

States Supreme Court has "recognized constitutional limits on the *type* of speech which may be the subject of state defamation actions." (Emphasis in original.) *Milkovich* v. *Lorain Journal Co.,* supra, 497 U.S. 16. The court has held that the following are merely rhetorical hyperbole, and are not libelous as a matter of law: the word "blackmail," as used in *Greenbelt Cooperative Publishing Assn.* v. *Bresler,* supra, 398 U.S. 14 ("even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the developer's] negotiating position extremely unreasonable"); and the word "traitor," as used in a union newsletter to describe a scab in *National Assn. of Letter Carriers* v. *Austin,* 418 U.S. 264, 286, 94 S. Ct. 2770, 41 L. Ed. 2d 745 (1974) (its use was "merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members towards those who refuse to join"). See *Milkovich* v. *Lorain Journal Co.,* supra, 16–17. Surely, the phrase "back room deals" is merely rhetorical hyperbole, and could not connote anything more to even the most careless reader.

Finally, the jury found libelous the statement that the plaintiff and her husband *are* business associates of Sheridan, which was published in a 1992 article in the Journal Inquirer that focused on the court proceedings pertaining to this libel suit. Although the defendants concede that the statement was not true, they correctly point out that the plaintiff was not on the commission in 1992. Therefore, this misstatement was not libelous because, at that time, the plaintiff and her husband were free to conduct business with Sheridan without there being a conflict of interest. An error published by a newspaper or other media can only form the basis for a libel suit if it casts the plaintiff in a bad light. Furthermore, in the context of the entire article, this minor misstatement, which was immediately corrected after

it had been called to the Journal Inquirer's attention, could not possibly reach the level of libel—it was simply too trivial. See *Strada* v. *Connecticut Newspapers, Inc.,* supra, 193 Conn. 322.

The overall substance of the articles published in the Journal Inquirer—that is, the plaintiff's suggestion as a member of the commission of a proposal that she knew would benefit a business associate of her family—was never challenged by the plaintiff. The trivial mischaracterizations that generated this litigation with its resultant costs underscore the threat libel suits pose to a free press. In this era of costly litigation, freedom of the press will be effectively destroyed unless meritless claims may be nipped in the bud. If the statements at issue are not libelous, then the suit must be terminated through summary judgment before burdensome discovery and other legal costs are incurred.[6] High legal costs can chill speech just as effectively as high jury verdicts. Therefore, expeditious resolution is essential, even in cases in which the words of the press have been hurtful, because we rely on the press to let us know what our government is up to.

---

[6] "Of course, the constitutional rights of freedom of the press must not be allowed to infringe on the constitutional right that all courts be open to redress an injury. Conn. Const., art. I, § 10. An appropriate vehicle to accommodate a balance between these rights is a motion for summary judgment. Our courts should resolve free speech litigation more expeditiously whenever possible. The perpetuation of meritless actions, with their attendant costs, chills the exercise of press freedom. To avoid this, trial courts should not hesitate to use summary judgment procedures where appropriate to bring such actions to a speedy end." (Internal quotation marks omitted.) *Dow* v. *New Haven Independent, Inc.,* supra, 41 Conn. Sup. 47.