**William LOEB, Plaintiff,**

v.

**NEW TIMES COMMUNICATIONS CORP., Robert Sam Anson and Gordon L. Weil, Defendants.**

**No. 75 Civ. 4727.**

United States District Court,
S. D. New York.

April 22, 1980.

Hall, McNicol, Hamilton & Clark, New York City, by E. Douglas Hamilton, New York City, for defendants.

Klotz & Gould, P.C., New York City, for plaintiff.

## MEMORANDUM AND ORDER

OWEN, District Judge.

Plaintiff William Loeb brought this libel action against New Times Communications Corp. ("*New Times*"), publisher of *New Times* magazine, and two reporters, Robert Sam Anson and Gordon L. Weil. The subject of this suit is an article written by defendants Anson and Weil entitled "Citizen Loeb," which appeared in *New Times* magazine on January 10, 1975. The article is a profile of Loeb. It contains anecdotes and commentary by the authors and others which are uniformly critical of Loeb's per-

sonal characteristics and behavior, as well as his business practices and political views.

Loeb claims that at least twenty-three separate statements in the article are libelous, either directly or by implication and innuendo. Defendants contend that most of the statements cited in the complaint (Complaint ¶ 10a–c, e, i–k, n, q, s, u, and w) are not libelous on their face and cannot be construed as libelous by implication or innuendo. The remaining statements (Complaint ¶ 10d, f–h, l, m, o, p, r, t and v), defendants assert, are protected by the first amendment because they concern a "public figure," *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), and were published without "actual malice", *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964). For these reasons, the defendants have moved for summary judgment under Fed.R.Civ.P. 56.

The undisputed facts are as follows. Loeb is the publisher of a daily newspaper, the *Manchester Union Leader* ("*Union Leader*") and a Sunday newspaper, the *New Hampshire Sunday News*, both widely circulated throughout New Hampshire.[1] Through these vehicles,[2] Loeb has earned the reputation, which he readily acknowledges, of being a controversial figure. Complaint ¶¶ 4–6. His outspoken criticism of prominent politicians and celebrities in diverse fields has frequently made him the target of national and regional media coverage.[3] Defendants' article focused on Loeb's role in the New Hampshire Presidential Primary, which, as the earliest state primary, enjoys nationwide publicity.[4] The authors'

1. The *Union Leader* is reported to be the largest newspaper in the State of New Hampshire.

2. In each edition of the *Union Leader*, Loeb publishes a signed front page editorial. Complaint ¶ 4.

3. *See e. g. Loeb v. Globe Newspaper Co.*, 489 F.Supp. 481 at 483 (D.Mass.1980):
 In the winter of 1972, the Manchester *Union Leader* received nationwide attention for its coverage of the New Hampshire Presidential Primary. During the course of the primary, the publisher of the newspaper engaged in a celebrated exchange with one candidate [Ed-

mond Muskie], and, as appears from the exhibits, the newspaper was dominated by colorful reporting and commentary on the primary, in the course of which the *Union Leader* itself became a popular topic of media commentary. The newspaper was the subject of at least three pieces in the Boston *Globe*, and those publications gave rise to the instant claims.

4. Loeb is described as the single most influential figure shaping the course of the New Hampshire Primary, and he does not dispute the facts asserted in the following excerpt from the *New Times* article:

clear intent was to portray an overwhelmingly negative picture of Loeb by presenting purported examples of his ridiculous idiosyncracies and prejudices, shady political maneuverings, and dishonest reporting practices. At the same time, the article purports to be an accurate and well-documented account of Loeb and his activities.[5]

The statements which Loeb claims are libelous by implication or innuendo may be briefly catalogued as follows.[6] The article describes the exterior of Loeb's home and the security devices he employs to protect it. Loeb claims that the innuendoes implicit in that description are that he is "a recluse in a fortress," whose "house pets are trained attack dogs assigned to patrol routes at plaintiff's residence," and that "Loeb lives abnormally in fear." Complaint ¶ 10a–c.

Defendants report that Loeb was influential in eliminating the state sales and income taxes in New Hampshire. The authors conclude that the repeal of this legislation resulted in New Hampshire ranking 47th among the 50 states in aid to education and last in expenditures for mental health. Loeb contends that this implies that he is "opposed to education and proper care for the mentally ill," and is "responsible" for New Hampshire's poor record in aid to education and mental health programs. Complaint ¶ 10e.

The article contains several statements attacking Loeb's editorial policies and practices.[7] According to Loeb, the defendants intend to convey the impression that he "advocates, authorizes and approves libelous publications," Complaint ¶ 10i, and "uses his newspaper only to injure or destroy other persons," Complaint ¶ 10j. The article quotes the *Boston Globe's* description of Loeb as "a near-Neanderthal," and his paper as "published by paranoids for paranoids." Loeb equates these epithets with an accusation that he and his employees suffer from a "serious mental disease or defect,"[8] Complaint ¶ 10k, and that Loeb "through the use of his newspapers, controls and directs the State of New Hampshire and its citizens," Complaint ¶ 10w.

Defendants report that Loeb's legal career "abruptly ended when he failed to make it through Harvard Law School." Loeb equates this statement with a representation that he was forced to leave law school because of academic failure when, in fact, he left voluntarily. Complaint ¶ 10n.

The article contains an account of an incident in which the husband of a woman later to marry Loeb was assaulted in New York. The incident is reported in the context of a description of the conflict between the two men over the woman, and Loeb's efforts to pressure her husband into granting her a divorce. Loeb contends that the intended innuendo of this report is that he

---

In 1949, at Loeb's urging, the state legislature voted to set the date of New Hampshire's presidential primary earlier than that of any other state in the nation. Since then, the New Hampshire primary has assumed an inordinate importance in the folklore of American politics. It matters little that Yankee, white New Hampshire is wholly unrepresentative of the rest of the country, or even that the winners of New Hampshire's primary often as not fail to win the presidency—New Hampshire is first and Americans have a fascination for firsts. And so the candidates and the press pour in, and, for a few weeks, the publisher of an obscure newspaper becomes one of the most powerful men in the country.

5. The introduction to the *New Times* article states that the investigation of Loeb lasted over a year, during which time Anson and Weil "interviewed more than 200 of Loeb's friends

and enemies, and poured through documents, records and court cases dating back the last 40 years."

6. Apart from a few minor inaccuracies, such as the height and color of the wall surrounding Loeb's house, the literal truth of these statements is not disputed.

7. For example, defendants report that "[n]ot even libel seems to bother the *Union Leader*," and that "Loeb dominates like a chief surgeon in an operating room. He not only decides who is to be cut up, but often specifies how, and into how many pieces."

8. The *Boston Globe* quotes were the subject of a separate libel suit against the publisher of that paper in which summary judgment was granted in the defendant's favor. *Loeb v. Globe Newspaper Co., supra, see* n. 3 *supra.*

**90**

"hired thugs for an illegal purpose." Complaint ¶ 10q.

The article refers to a "mysterious fire" which destroyed the printing plant of a newspaper in competition with Loeb's publications. Loeb argues that this suggests he was responsible for the fire and is an arsonist. Complaint ¶ 10s.

Finally, defendants report that Loeb received a loan from the Teamsters' pension fund which "remained secret for several months until a reporter on a rival New Hampshire Daily discovered it." Loeb claims this implies that he "secretly secured a two million dollar loan and deliberately withheld such transaction from knowledge of the general public." Complaint ¶ 10v.

█ The threshold question presented by Loeb's claim as to the statements described above is whether the innuendoes which allegedly flow from these statements are reasonable. Only if the statements could fairly be read to libel the plaintiff may defendants be held accountable for their publication. *El Meson Espanol v. NYM Corp.*, 521 F.2d 737, 739–40 (2d Cir. 1975). Under New York law, applicable here, whether a publication is susceptible of a libelous interpretation is a question of law for the judge to resolve. *Tracy v. Newsday, Inc.*, 5 N.Y.2d 134, 136, 182 N.Y.S.2d 1, 155 N.E.2d 853 (1959). When making this determination, "the court will not pick out and isolate particular phrases but will consider the publication as a whole." *James v. Gannett Co.*, 40 N.Y.2d 415, 419, 386 N.Y.S.2d 871, 874, 353 N.E.2d 834, 838 (1976) (citation omitted); *see also Ladany v. William Morrow & Co., Inc.*, 465 F.Supp. 870 (S.D.N.Y.1978). Moreover, the innuendo alleged "may not enlarge upon the meaning of the words so as to convey a meaning that is not expressed." *Tracy v. Newsday, Inc., supra*, 5 N.Y.2d at 136, 182 N.Y.S.2d at 4, 155 N.E.2d at 855 (citation omitted).

█ Upon careful review, I find that the innuendoes which plaintiff derives from the statements discussed above, Complaint ¶ 10a–c, e, i–k, n, q, s, u, and w, are "strained, unreasonable and unjustified,"

*Tracy v. Newsday, Inc., supra* at 137, 182 N.Y.S.2d 1, 155 N.E.2d 853, *quoting Tracy v. Newsday, Inc.*, 160 N.Y.S.2d 152, 154 (Sup.Ct.1957), and therefore they cannot be properly attributed to the defendants. For example, the description of Loeb's home conveys no more than the reporters' impression of what they saw. In addition, the statement that Loeb "failed to make it through Harvard Law School" is literally true, since he did not graduate. The phrase is somewhat ambiguous since the reason Loeb did not finish law school is not given. Nevertheless, the ambiguity cannot be stretched to convey a meaning not expressed, i. e., that Loeb was forced to leave law school for academic reasons. Similarly, defendants' statement that the loan from the Teamsters' pension fund "remained secret," merely refers to the fact that the loan was not generally known to the public until the article about it was published in the *Concord Monitor*. Contrary to plaintiff's contention, it is irrelevant to the question of whether this statement was libelous that this information was in fact a matter of public record; defendants do not represent that Loeb deliberately tried to keep the information secret, but merely observed that the information had not been widely publicized.

█ A number of the more provocative statements are simply the authors' commentary on undisputed facts. They are editorial opinions which fall into the category of statements which "depend for [their] correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974)(footnote omitted). *See also Yiamouyiannis v. Consumers Union*, 619 F.2d 932 at 941 (2d Cir. 1980). First, the defendants' statement that "[n]ot even libel seems to bother the *Union Leader*," is an opinion drawn from the fact that the newspaper was sued successfully for libel on a number of occasions. Second, the depiction of Loeb as having a "stranglehold on the life of an entire state," through his newspapers is commentary based on certain facts concern-

ing the news media in New Hampshire, i. e., that the State has only one commercial television station, that the *Union Leader* is the only paper with statewide distribution, and that the *New Hampshire Sunday News* is the only Sunday paper published in the State. Third, the description of Loeb as a "near-Neanderthal" and of the *Union Leader* as a newspaper published "by paranoids for paranoids," cannot be construed as representations of fact. *See* note 8, *supra.* Finally, the same is true of the depiction of Loeb's role in the editorial process as that of "a chief surgeon in an operating room." These statements at worst are "rhetorical hyperbole," or "vigorous epithet" entitled to absolute protection under the first amendment. *Greenbelt Cooperative Publishing Assn., Inc. v. Bresler,* 398 U.S. 6, 14, 90 S.Ct. 1537, 1541, 26 L.Ed.2d 6 (1970).

■ Only two of the statements which are allegedly libelous by innuendo require extended comment. One concerns the report of a "mysterious fire" which destroyed the printing plant of a New Hampshire newspaper established by Loeb's former partner, Leonard Finder. Plaintiff contends that defendants intend to convey the impression that Loeb was responsible for the fire. However, defendants only report the uncontested fact that a fire of unknown origin drove one of Loeb's competitors out of the newspaper business. Since the reader is free to draw his own conclusion, the statement itself falls far short of a charge that Loeb committed a criminal offense. *See Greenbelt Cooperative Publishing Assn., Inc. v. Bresler, supra.*

■ The second statement appears in a discussion of the events leading to Loeb's marriage to Nackey Scripps Gallowhur, the former wife of George Gallowhur. Defendants report that Gallowhur discovered that Loeb was having an affair with Nackey and had him arrested in an alienation of affections action. Following that embarrassing

experience, Loeb apparently threatened to expose Gallowhur as an alleged homosexual unless he consented to divorce Nackey. Gallowhur was reportedly "unimpressed" by this tactic. Nevertheless, he ultimately did grant the divorce following an incident in New York City during which he was pulled from his car and attacked by unidentified assailants. The assault, defendants report, left Gallowhur "[f]earful . . . for his life" and willing to grant Nackey a divorce.

Loeb does not deny that these events occurred. He objects, however, to the fact that defendants link the assault incident to Loeb's dispute with Gallowhur over Nackey. In essence, Loeb seeks to hold the defendants accountable for the representation, which they did not make, that Loeb hired the two men to attack Gallowhur in order to pressure him into consenting to a divorce.

The Gallowhur incident is obviously reported in a suggestive context, but defendants are careful to stop short of claiming that Loeb hired the assailants. The reasonable implication is that *Gallowhur believed* Loeb might have been responsible for the attack and decided not to risk further confrontation with him. There is no suggestion that either the defendants or Gallowhur possessed any evidence of Loeb's involvement in the incident.[9] Instead, defendants have reported the facts accurately and carefully, avoiding the defamatory conclusion which Loeb claims they intended the reader to draw. Thus, defendants' report of the Gallowhur incident is not libelous by implication or innuendo.

■ The remaining statements identified in the complaint, Complaint ¶ 10d, f–h, l, m, o, p, r, t and v, may be construed as libelous directly or by implication. Defendants contend, however, that the first amendment shields them from liability for publishing these statements. It is well established that the first amendment

---

**9.** Defendant Anson indicated in his deposition testimony that the report of the incident was based on the fact that "Mr. Gallowhur had some reason in his own mind to be apprehensive that this attack on him was in some fash- ion, however remote, connected to the divorce action." Deposition of Robert Sam Anson, at 11. He also denies that Gallowhur told him that Loeb hired the two assailants. *Id.* at 15.

prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not. *New York Times Co. v. Sullivan*, 376 U.S. at 279–80, 84 S.Ct. at 726. The same test has been applied, at least on matters of public interest, to restrict the cause of action available to "public figures," i. e., those persons who command a substantial amount of public attention either by their position in society or by purposefully thrusting themselves into the forefront of particular public controversies. *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 154–55, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094 (1967). *See also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1974).

 It is clear that Loeb is a "public figure" within the meaning of these authorities. Plaintiff is referred to in the complaint as a "public figure," and this point is conceded by his attorneys in papers submitted in opposition to defendants' summary judgment motion.[10] The pleadings describe Loeb as one who "regularly takes strong public stands on controversial issues . . . [and who] frequently criticizes the performance, or public statements of prominent persons . . . ." Complaint ¶ 4. In addition, the complaint states that "[b]ecause of the controversial nature of plaintiff Loeb and the *Union Leader*, he is often the subject of national and regional media coverage." Complaint ¶ 6. Thus, as another federal court recently found, Loeb's own description of himself "neatly fits the Supreme Court's recent definition of public figures . . . ." *Loeb v. Globe Newspa-*

*per Co.*, 489 F.Supp. 481 at 485 (D.Mass. 1980).

As a public figure, plaintiff must show that the allegedly libelous statements were published with "actual malice." Plaintiff has not shown, through depositions or affidavits, that any of the allegedly libelous statements were published with knowledge of their falsity. Therefore, he can prevail only if he demonstrates with "convincing clarity" that defendants published the statements with reckless disregard of whether they were true.[11] Reckless disregard may be found where the publisher of a statement had a "high degree of awareness of . . . [its] probable falsity," *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964), or "in fact entertained serious doubts as to the truth of his publication," *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). Only if there is a factual basis upon which a jury could find a "subjective awareness of probable falsity," *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 335 n. 6, 94 S.Ct. 2997, 3005, 41 L.Ed.2d 789, can defendants' motion for summary judgment be denied. *See Wasserman v. Time, Inc.*, 424 F.2d 920, 922 (D.C.Cir.1970) (Wright, J. concurring), *cert. denied*, 398 U.S. 940, 90 S.Ct. 1844, 26 L.Ed.2d 273 (1970).

 To support his claim of actual malice, plaintiff presents several arguments directed to defendants' investigative practices. First, Loeb claims that it was reckless for Anson and Weil not to check with him as to the accuracy of information obtained from biased sources. However, there is no evidence that these sources, even if biased, would necessarily provide false information.[12] More important, plaintiff

---

10. *See* Complaint ¶. 4, and the Affidavit of Ralph Warren Sullivan, at 2.

11. "Convincing clarity" is defined as a standard "intermediate between the normal 'preponderance of the evidence' civil standard and the 'beyond the reasonable doubt' criminal standard." *Nader v. de Toledano*, 408 A.2d 31, 49 (D.C.1979), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (U.S.1980). *See also*

*Gertz v. Robert Welch, Inc., supra,*, 418 U.S. at 342, 94 S.Ct. at 3008 and *Yiamouyiannis v. Consumers Union of the United States, supra*, at 940.

12. Loeb identifies only four sources who he claims were prejudiced against him: Mrs. Eleanor Loeb, the plaintiff's ex-wife; George Gallowhur, the ex-husband of the plaintiff's present wife; Joe Grandmaison, a Democratic

has not shown that the defendants' reliance upon any of the allegedly biased individuals was unreasonable. In any event, failure to verify statements with the plaintiff and reliance upon some biased sources, in themselves, do not amount to reckless disregard of the truth. *St. Amant v. Thompson, supra*, 390 U.S. at 730, 88 S.Ct. at 1325.

 Plaintiff next contends that since the story was not "hot news," defendants were required to maintain higher standards of investigative reporting. On the record presented, however, there is no evidence that the individual defendants failed to carry out their duties as reporters in a conscientious and professional manner. It cannot be said that the defendants' conduct constitutes an "extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." *Curtis Publishing Co. v. Butts, supra*, 388 U.S. at 155, 87 S.Ct. at 1991. Loeb himself was interviewed by the defendants, as were a substantial number of other individuals.[13] Defendants Anson and Weil have submitted a detailed affidavit as well as deposition testimony demonstrating that they had a sufficient factual basis to support each of the statements in question. Furthermore, read in the context of the entire article, none of these statements is "so inherently improbable that only a reckless man would have put them in circulation." *St. Amant v. Thompson, supra*, 390 U.S. at 732, 88 S.Ct. at 1326. The minor errors allegedly contained in reports of certain details and the speculative nature of a few of the statements are not sufficient to warrant a finding of actual malice. As the Supreme Court recently noted:

> Realistically, . . . some error is inevitable; and the difficulties of separating fact from fiction convinced the Court in *New York Times, Butts, Gertz*, and similar cases to limit liability to instances where some degree of culpability is present in order to eliminate the risk of undue self-censorship and the suppression of truthful material.

*Herbert v. Lando*, 441 U.S. 153, 171–72, 99 S.Ct. 1635, 1647, 60 L.Ed.2d 115 (1979). Therefore, one "who maintains a standard of care such as to avoid knowing falsehood or reckless disregard of the truth is thereby given assurance that those errors that nonetheless occur will not lay him open to an indeterminable financial liability." *Time, Inc. v. Pape*, 401 U.S. 279, 291, 91 S.Ct. 633, 640, 28 L.Ed.2d 45 (1971).

 Plaintiff has presented no evidence to contradict the overwhelming showing by defendants that the article was prepared with a reasonable concern for the truth. In essence, plaintiff relies upon the character and content of the publication to support his claim that defendants acted with reckless disregard of the truth. This, however, is a constitutionally impermissible evidentiary basis for a finding of actual malice. *Washington Post Co. v. Keogh*, 365 F.2d 965, 969 (D.C.Cir.1966), *cert. denied*, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967).

 Plaintiff's final argument is that summary judgment on the question of actual malice is inappropriate because it involves issues of motive and intent. *See Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *cf. Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1969).

New Hampshire politician never supported by the Loeb newspaper; and Tom Zwicker, a reporter who had previously made adverse statements about the plaintiff. He relies exclusively on the inherently hostile relationship which he has with these individuals to demonstrate their bias. The ill will these individuals could bear for Loeb would not, however, automatically disqualify them as legitimate sources of information. Nor would defendants' knowledge of this potential bias impose on them an additional burden of extensive independent investiga-

tion. *See Hotchner v. Castillo-Puche*, 551 F.2d 910, 913–14 (2d Cir. 1977), *cert. denied sub nom. Hotchner v. Doubleday & Co., Inc.*, 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977).

13. According to testimony taken at a pretrial deposition, defendants Anson and Weil interviewed "at rough guess, between 75 and 100 sources." Deposition of Robert Sam Anson, at 4–5. Some of these sources were friends, employees and former employees of the plaintiff. *Id.* at 28.

In assessing this contention, the court is mindful of the Second Circuit's recent pronouncement that it is no longer permissible to take into account the "chilling effect" a libel suit may have on the exercise of first amendment rights. *Yiamouyiannis v. Consumer Union of the United States, Inc.*, 619 F.2d 932, at 940 (2d Cir. 1980).[14] The present rule is that

". . . neither grant nor denial of a motion for summary judgment is to be preferred. Defamation actions are, for procedural purposes, such as discovery, see *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979), or for summary judgment, to be treated no differently from other actions; . . . ."

*Id.* at 940. Nevertheless, the requirement that in libel actions plaintiff must prove "actual malice" with "convincing clarity" imposes a somewhat greater burden of proof than in other civil actions.[15]

 A thorough review of the record in this case reveals no facts on which a jury could find with convincing clarity that defendants, or anyone responsible for the publication of the *New Times* article, acted with actual malice. There has been full discovery on the issue of actual malice, including lengthy depositions of Anson and Weil as well as the plaintiff. The reporters' depositions indicate that in preparation of the article, they conducted numerous interviews of a variety of sources. They also reviewed many articles and other documentary material. None of the facts concerning these investigative reporting activities are challenged by Loeb. As explained above, the fact that Anson and Weil failed to verify certain information with Loeb personally, and the fact that some of their sources may have been biased against Loeb, is not evidence of actual malice. Thus, plaintiff's proof of actual malice is confined entirely to the allegations of his complaint and inferences from the text of the article. Such evidence will not support a claim that defendants were reckless as to the truth or falsity of their publication. *See Washington Post Co. v. Keogh*, 365 F.2d 965 (D.C.Cir.1966), cert. denied, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967); *Medina v. Time, Inc.*, 439 F.2d 1129 (1st Cir. 1971); *Hahn v. Sargent*, 523 F.2d 461, 466–68 (1st Cir. 1975), cert. denied, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 54 (1976).

Accordingly, defendants' motion for summary judgment is granted and the action is dismissed.

So ordered.

---

**14.** Until recently, consideration of the "chilling effect" of a lawsuit for defamation had led many courts, including this one, to regard the granting of summary judgment in libel suits as the "rule" rather than the "exception." *See e. g. Yiamouyiannis v. Consumers Union of the United States*, No. 78–4721, slip op. at 2 (S.D. N.Y. May 30, 1979), aff'd on other grounds, No. 79 ·7541, 619 F.2d 932 (2d Cir. March 19, 1980); *Guitar v. Westinghouse Electric Corp.*, 396 F.Supp. 1042, 1953 (S.D.N.Y.1975), aff'd mem., 538 F.2d 309 (2d Cir. 1976); *Trentler v. Meredith Corp.*, 455 F.2d 255, 257 n. 1 (8th Cir. 1972); *Washington Post Co. v. Keogh*, 365 F.2d 965, 967–68 (D.C.Cir.1966), cert. denied, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967). The new rule adopted by the Second Circuit in *Yiamouyiannis* is derived from footnotes in two recent Supreme Court cases: *Hutchinson v. Proxmire*, 443 U.S. 111, 120 n. 9, 99 S.Ct. 2675, 2680 n. 9, 61 L.Ed.2d 411 (1979) and *Wolston v. Reader's Digest Association*, 443 U.S. 157, 161 n. 3, 99 S.Ct. 2701, 2704 n. 3, 61 L.Ed.2d 450 (1979). *See also, Nader v. de Toledano, supra.*

**15.** This standard requires a clear and convincing showing, which may be by circumstantial evidence, of defendants' actual state of mind—either subjective awareness of probable falsity or actual intent to publish falsely. Therefore, a judge in denying a defendant's summary judgment motion must conclude that, based on the evidence asserted in the plaintiff's affidavits, "a reasonable jury *could* find malice with convincing clarity." *Nader v. de Toledano, supra*, 408 A.2d at 49 (emphasis in original); *see Guam Federation of Teachers, Local 1581 v. Ysrael*, 492 F.2d 438, 441 (9th Cir.), cert. denied, 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974).

*Yiamouyiannis v. Consumers Union*, 619 F.2d 932 at 941 (2d Cir. 1980).