## LEWIS A. LIZOTTE *v.* RICK C. WELKER ET AL.*

Superior Court        Judicial District of      File No. CV89365237S
Hartford-New Britain at Hartford

Memorandum filed May 17, 1996

* Affirmed. *Lizotte* v. *Welker*, 244 Conn. 156, 709 A.2d 1 (1998).

*James W. Sherman*, for the plaintiff.

*Sorokin, Sorokin, Gross, Hyde & Williams*, for the defendants.

KOLETSKY, J. The critical issue in this motion is whether newspaper articles that suggest that a developer's contributions to a political committee positively influenced a settlement of litigation resulting in approval of his residential development application, can constitute libel by raising an inference of "bribery?"

On September 5, 1986, the planning and zoning commission of the town of Enfield (commission) declared a moratorium on all residential applications. This moratorium was extended until December 12, 1987.

On July 31, 1987, the plaintiff, Lewis A. Lizotte, a real estate developer, filed an application for zoning approval for a 368 unit residence known as Oldefield II (Oldefield). On September 3, 1987, the plaintiff requested a public hearing to discuss his application. The zoning commission denied this request citing the aforementioned moratorium. On December 1, 1987, the plaintiff demanded certification from the zoning commission because of its failure to act on his application within the statutorily required period of sixty-five days. The zoning commission again denied his request for the same reason. On December 9, 1987, the plaintiff appealed to the Superior Court, requesting approval and certification of his application as a matter of law. He claimed that the moratorium ordinance, or at least the extension of the moratorium, was illegal pursuant to General Statutes § 8-3 (d), which requires the filing of such ordinances with the town clerk. On October 6, 1988, the zoning commission met with its attorney and was advised to approve the plaintiff's application. At

that time, the zoning commission decided to approve the application "as a matter of law" on the condition that the plaintiff would withdraw his lawsuit and keep the terms of the approval confidential. On October 7, 1988, the zoning commission held an executive session where the plaintiff's application and undated certification were approved and filed with the town clerk. On October 26, 1988, George Layng, a reporter for the defendant Journal Inquirer (Journal), discovered those documents.

On November 1, 1988, Layng published the first Journal article detailing these events and calling for further investigation. Between November 1, 1988, and August, 1989, a total of thirty-three articles were published regarding this transaction. On November 6, 1988, Ralph Williams, Jr., and Chris Powell, both employees at the Journal, filed a complaint with the freedom of information commission (commission) requesting an investigation and corrective action. On July 12, 1989, the commission investigated the transaction and rescinded the zoning commission's certification of approval of the plaintiff's application. No appeal was taken from the commission's invalidation of the zoning commission's certification of the plaintiff's subdivision.

On August 2, 1989, the plaintiff filed a summons and complaint against Rick C. Welker, Susan Olender, Williams, Powell, Layng and Kim Nauer for slander, and against the Journal for the tortious conduct of its employees. The cases against Welker and Olender were dismissed in 1992. Williams, Powell, Nauer, Layng and the Journal filed a motion for summary judgment on October 11, 1995. The plaintiff filed a memorandum in opposition and the counteraffidavit of the plaintiff on January 22, 1996.

"Defamation is made up of the twin torts of libel[1] and slander—the one being, in general, written while

---

[1] "While all libel was once actionable without proof of special damages, a distinction arose between 'libel per se' and 'libel per quod.'" *Battista* v.

the other in general is oral . . . ." W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 111, p. 771; see also *Charles Parker Co.* v. *Silver City Crystal Co.*, 142 Conn. 605, 611–12, 116 A.2d 440 (1955). Defamation is "that which tends to injure 'reputation' in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him." W. Prosser & W. Keeton, supra, p. 773. "A prima facie case of defamation is made when the plaintiff demonstrates that: 1. [a] defamatory statement was made by the defendant; 2. [t]he defamatory statement identifies the plaintiff to a reasonable reader; 3. [t]he defamatory statement is published to a third person; and; 4. [t]he plaintiff's reputation suffers injury." *Slez* v. *Komarow*, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 227732 (December 29, 1986) (2 C.S.C.R. 176, 177) (*Harrigan, J.*).

The law recognizes a distinction between "public" and "private" persons. "Under the first amendment to

*United Illuminating Co.*, 10 Conn. App. 486, 491, 523 A.2d 1356 (1987), cert. denied, 204 Conn. 802, 803, 525 A.2d 1352 (1987). "A libel per quod is not libelous on the face of the communication, but becomes libelous in light of extrinsic facts known by the recipient of the communication." Id. "When a plaintiff brings an action in libel per quod, he must plead and prove actual damages in order to recover." Id.

On the other hand, libel per se "is a libel the defamatory meaning of which is apparent on the face of the statement and is actionable without proof of actual damage." Id., 491–92. "[A] plaintiff may recover general damages where the defamation in question constitutes libel per se." Id., 492. " 'When the defamatory words are actionable per se, the law conclusively presumes the existence of injury to the plaintiff's reputation. He is required neither to plead nor to prove it.' " Id., quoting *Urban* v. *Hartford Gas Co.*, 139 Conn. 301, 308, 93 A.2d 292 (1952). "The individual plaintiff is 'entitled to recover, as general damages, for the injury to his reputation and for the humiliation and mental suffering which the libel caused him.' " *Battista* v. *United Illuminating Co.*, supra, 10 Conn. App. 492, quoting *Proto* v. *Bridgeport Herald Corp.*, 136 Conn. 557, 571, 72 A.2d 820 (1950). " 'Whether a published article is libelous per se' " is a question for the court and " 'must be determined upon the face of the article itself.' " *Battista* v. *United Illuminating Co.*, supra, 492, quoting *Proto* v. *Bridgeport Herald Corp.*, supra, 565.

the United States constitution, a public official, in order to recover damages for a defamatory falsehood relating to his or her official conduct, must prove that the statement was made with actual malice." *Woodcock* v. *Journal Publishing Co.*, 230 Conn. 525, 535, 646 A.2d 92 (1994), cert. denied, 513 U.S. 1149, 115 S. Ct. 1098, 132 L. Ed. 2d 1066 (1995).

The United States Supreme Court in *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974), established the standard of review to be applied to a private person seeking to bring a defamation action. "The principal issue in this case is whether a newspaper or broadcaster that publishes defamatory falsehoods about an individual who is neither a public official nor a public figure may claim a constitutional privilege against liability for the injury inflicted by those statements." Id., 332. The court concluded, "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual. This approach provides a more equitable boundary between the competing concerns involved here. It recognizes the strength of the legitimate state interest in compensating private individuals for wrongful injury to reputation, yet shields the press and broadcast media from the rigors of strict liability for defamation. At least this conclusion obtains where, as here, the substance of the defamatory statement 'makes substantial danger to reputation apparent.' " Id., 347–48.

In Connecticut, "[i]t is clear that before a party will be held liable for libel, there must be an unprivileged publication of a false and defamatory statement. . . . A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. In the application of

this idea it is enough that the communication would tend to prejudice the plaintiff in the eyes of a substantial and respectable minority, but in such a case it must be shown that the communication did reach one or more persons of that minority group. This would normally be presumed, if the communication was a public one which was made in the newspaper or over radio or television. . . . [I]f the alleged defamatory words could not reasonably be considered defamatory in any sense, the matter becomes an issue of law for the court. . . . When such a determination is made, the words that are claimed to be defamatory are given their natural and ordinary meaning and are taken as reasonable persons would understand them. . . . Moreover, the words must be viewed in the context of the entire editorial." (Citations omitted; internal quotation marks omitted.) *Dow* v. *New Haven Independent, Inc.*, 41 Conn. Sup. 31, 36, 549 A.2d 683 (1987). In Connecticut, a private individual "need only prove, by a preponderance of the evidence, negligence in the failure to investigate the facts properly prior to publication." *Miles* v. *Perry*, 11 Conn. App. 584, 589, 529 A.2d 199 (1987).

It is conceded by the defendants, for the purpose of this summary judgment motion, that the plaintiff is a private person. The defendants argue that the statements published by the Journal are "opinions" that are constitutionally protected and, therefore, are not libelous. The plaintiff, in his counteraffidavit, provides "specific facts in this affidavit, which contradict those offered in the defendants' affidavit and memorandum, and which demonstrate the existence of genuine issues of fact." Of the forty-one submitted articles, only eleven articles require detailed analysis to determining their efficacy in establishing the plaintiff's cause of action against the defendants. Articles one, two, three, four, six through nine, thirteen, fourteen, sixteen, seventeen, nineteen, twenty, twenty-three through thirty-three,

thirty-seven, forty and forty-one allegedly report the events surrounding the approval of the plaintiff's application. These statements appear to be "facts" in that they report the actual events that occurred involving the plaintiff's application and subsequent approval. While the court recognizes that "[e]ven if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact"; *Milkovich* v. *Lorain Journal Co.*, 497 U.S. 1, 18–19, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990); the court nevertheless finds that the plaintiff's mere objections to the statements "illegal deal" and "illegal out-of-court settlement" do not render them libelous. Although the "language used in the editorial in this case . . . is vehement, caustic and unpleasant . . . that does not make it libelous under the law." *Dow* v. *New Haven Independent, Inc.*, supra, 41 Conn. Sup. 34. In light of the commission's invalidation of the "out-of-court settlement," or "deal," the court finds that these "facts" as reported by the Journal are substantially accurate and cannot give rise to a cause of action in defamation.

In his counteraffidavit, the plaintiff objected to the implication created by the Journal that the zoning commission accepted "an out-of-court settlement in a lawsuit filed by a real estate developer, Lewis A. Lizotte of Somers." Conversely, the plaintiff attested that he "fully performed the September 1988 Compromise and Settlement Agreement during September on my part to be performed, and carried out related requests of the Commission." Later, however, the plaintiff attested, "[t]he fact is that I performed the September Compromise and Settlement Agreement in September, *the only term of which was the withdrawal of the Mandamus action* which was delivered to the Commission in September." (Emphasis added.) The court finds that the

Journal articles which stated that the plaintiff agreed to withdraw his mandamus action upon the zoning commission's agreement to approve his application and to issue a certification was accurately reported. The plaintiff's objection to the form of the report, therefore, is not actionable as libel.

Similarly, the plaintiff states that the Journal erroneously reported that the zoning commission "approved" his certification. The plaintiff claims that the application was approved and the certificate issued "as a matter of law." While the plaintiff had a statutory right to relief, the zoning commission did ultimately approve his application as per their September Compromise and Settlement Agreement.[2] The plaintiff further objects to the statements published by the Journal on November 4, 1988, which stated that "[t]he [zoning commission's] secret approval of a big condominium project coincides with generous contributions by the developer and his lawyer." Despite his objection, however, the plaintiff does not refute or deny the truthfulness of the statement. In *Goodrich* v. *Waterbury Republican-American, Inc.*, 188 Conn. 107, 113, 438 A.2d 1317 (1982), our Supreme Court held that where "the main charge, or gist, of the libel is true," minor errors that do not change a reader's perception of the statement do not make the statement actionable. (Internal quotation marks omitted.) In *Philadelphia Newspapers, Inc.* v. *Hepps*, 475 U.S. 767, 777, 106 S. Ct. 1558, 89 L. Ed. 2d 783 (1986), the United States Supreme Court held that "the common-law presumption that defamatory speech is false cannot stand when a plaintiff seeks damages against a media defendant for speech of public concern." In other

[2] The plaintiff stated in his counteraffidavit that: "On October 6, 1988 the [zoning commission] performed the September Compromise and Settlement Agreement, the only term of which for it to perform was the issuance of the statutory certificate for filing on the public Land Records."

words, the court fashioned "a constitutional require-
ment that the plaintiff bear the burden of showing fal-
sity, as well as fault, before recovering damages." Id.,
776. "Although recognizing that requiring the plaintiff
to show falsity will insulate from liability some speech
that is false, but unprovably so, the Court believed that
this result was justified on the grounds that placement
by state law of the burden of proving truth upon media
defendants who publish speech of public concern
deters such speech because of the fear that liability will
injustifiably result." (Internal quotation marks omitted.)
*Milkovich* v. *Lorain Journal Co.*, supra, 497 U.S. 16.

Accordingly, the court holds that, even if the court
dwelt on and accepted the plaintiff's claims regarding
the minor factual inaccuracies in the statements con-
tained in articles one, two, three, four, six through nine,
thirteen, fourteen, sixteen, seventeen, nineteen, twenty,
twenty-three through thirty-three, thirty-seven, forty
and forty-one, the statements contained in these articles
fail to meet the necessary threshold, as previously dis-
cussed, to give rise to a cause of action for libel as a
matter of law.

Of the remaining articles, the following statements
are most susceptible to a "libelous" interpretation based
on holdings of relevant United States and Connecticut
Supreme Court case law. Statement one: "How could
public officials betray the public trust so brazenly. . . .
[S]uch generous contributions to the Enfield Demo-
cratic Chair slush fund. . . . His slush fund sure seems
to know where to start." Article five–editorial, "Old
Racket, New Cast," November 4, 1988.

Statement two: "[W]hy the developer and his lawyer
gave $4000 to Chairman Tyler's slush fund as the secret
deal was being made, Enfield will know that its council
is part of the fix too." Article ten–editorial, "Issue in

secret Enfield condo deal is political fix, not missing paper," November 11, 1988.

Statement three: "[A] secret, illegal, sleazy and possibly corrupt deal . . . raise[s] a question of bribery." Article twelve–editorial, "Council condones zoning scandal; will prosecutor?" November 17, 1988.

Statement four: "[T]his backroom deal." Article fifteen–article, "Who on Enfield council will fight secret zoning deal?" November 30, 1988.

Statement five: "What seems to have been a political payoff's outright purchase of zoning approval in Enfield. . . ." Article twenty-two–editorial, "Misconduct finding against LeBorious is supported by politics, not Evidence," December 26, 1988.

Statement six: "It looks like a payoff," Powell said. "I don't know if it's a payoff." Article thirty-four–article, "Ethics Commission puts off Oldefield probe," January 18, 1989.

Statement seven: "And the old racket continues in Enfield with a new cast of characters." Article thirty-five, January 27, 1989.

Statement eight: "What was the real purpose for the secret deal and the blatant, coverup attempt?" Article thirty-six–editorial, "Ethics Commission in Enfield has mixed up priorities," February 6, 1989.

Statement nine: "So amid some maneuvers that had political and even corrupt implications, the commission settled the developer's lawsuit by approving condos in secret . . . after having contributed generously to the slush fund." Article thirty-eight–editorial," Enfield zoning commission can escape Oldefield mess by avoiding more secrecy," August 8, 1989.

The court's task is to determine if, standing alone, the statements as a "matter of law" can be libelous. In

making this determination, the court must first analyze the issue of "fact versus opinion" distinction. "Some statements clearly fall within the protection of the first amendment and have been referred to as 'pure' opinions. This is the type where the defendant states the fact upon which he or she bases the opinion, or the opinion is based upon facts that are common knowledge, or the facts upon which the opinion is based are readily accessible to the recipient." *Dow* v. *New Haven Independent, Inc.*, supra, 41 Conn. Sup. 38.

"Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact." *Gertz* v. *Robert Welch, Inc.*, supra, 418 U.S. 339–40.

"If the facts that are criticized or commented upon are *not* stated or known, however, then fair comment is no defense. The reason for this distinction is as follows: an opinion must be based upon facts; if the facts are neither known nor stated, then a defamatory opinion implies that there are undisclosed defamatory facts which justify the opinion. . . . The damage of such an implication is that the person defamed becomes the victim of the prejudiced and distorted judgment of not only the defamer, but also of everyone who hears and believes the opinion without knowing that it is based on incorrect and untrue facts. The precise contours of the privilege of fair comment have never been fully articulated, since the United States Supreme Court chose to lay down broad rules of general application rather than opt for an ad hoc resolution of the competing interests in each case. [Id.], 343. Our review of the case law from *New York Times Co.* [v. *Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)] through *Gertz*, however, leads us to conclude that expressions

of 'pure' opinion (those based upon known or disclosed facts) are guaranteed virtually complete constitutional protection. Expressions of 'mixed' opinion, however, are privileged only where made (1) by members of the press or news media; (2) about matters of public interest or concern; and (3) without knowingly or recklessly distorting the facts upon which they are based." (Citations omitted; emphasis in original.) *Goodrich* v. *Waterbury Republican-American, Inc.*, supra, 188 Conn. 118–19.

This third factor is the functional equivalent of "malice," as that term is commonly used in defamation litigation. See id., 119 n.10.

Statements one, two, three, five, eight and nine are contained in editorials, clearly marked as such.

It is relevant to distinguish between statements contained in editorials versus statements contained in articles. In *Dow* v. *New Haven Independent, Inc.*, supra, 41 Conn. Sup. 42, the court held that, "[f]inally, the statements are contained in an editorial on the opinion-editorial page, which is of great significance. It is clearly entitled opinion and editorial in bold and outstanding letters. And it is obvious that editorial has its common, ordinary and elementary meaning—that is, an article in a publication expressing the *opinion* of its editors or publishers." (Emphasis in original.)

This, however, does not mean that all statements found in editorials are protected speech. In *Milkovich* v. *Lorain Journal Co.*, supra, 497 U.S. 18–19, the United States Supreme Court specifically stated, "[t]hus, we do not think this passage from *Gertz* was intended to create a wholesale defamation exemption for anything that might be labeled 'opinion'. . . . Not only would such an interpretation be contrary to the tenor and context of the passage, but it would also ignore the

fact that expressions of 'opinion' may often imply an assertion of objective fact. If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, 'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, 'Jones is a liar.' As Judge Friendly aptly stated: '[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words "I think." ' ' " (Citation omitted.)

The court further held, "[f]oremost, we think *Hepps* stands for the proposition that a statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least in situations, like the present, where a media defendant is involved. Thus, unlike the statement, 'In my opinion Mayor Jones is a liar,' the statement, 'In my opinion Mayor Jones shows his abysmal ignorance by accepting the teachings of Marx and Lenin,' would not be actionable. *Hepps* ensures that a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection. . . . Similarly, where such a statement involves a private figure on a matter of public concern, a plaintiff must show that the false connotations were made with some level of fault as required by *Gertz*." (Citations omitted.) Id., 19–21.

This court holds, despite the defendants' assertions to the contrary, that these statements are not automatically protected speech because they appeared in an

editorial. The court must look to the words as written in order to make this determination and apply the standard for "mixed" factual opinion set out in *Goodrich*.

The plaintiff's strongest claims revolve around the use of the following terms found in the aforementioned editorials: "contributions to slush funds"; "part of the fix"; "secret, illegal and corrupt deals"; "payoffs"; "blatant coverup attempt"; and, "maneuvers with political and corrupt implications."

In *Greenbelt Cooperative Publishing Assn.* v. *Bresler*, 398 U.S. 6, 90 S. Ct. 1537, 26 L. Ed. 2d 6 (1970), the United States Supreme Court addressed the question of whether a real estate developer and state legislator, admittedly a public figure, could recover against a newspaper-defendant for describing his negotiating position as blackmail. The court held that "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the plaintiff's] negotiating position extremely unreasonable." Id., 14.

In *Loeb* v. *Globe Newspaper Co.*, 489 F. Sup. 481, 483 (D. Mass. 1980), the defendant newspaper described the plaintiff newspaper as " 'probably the worst newspaper in America,' " and stated that it was " 'a newspaper by paranoids for paranoids.' " It accused the plaintiff editor of having "been fined three million dollars in a prior legal action, [and stated] that he 'edits his paper like a 19th Century yellow journal,' that his views are 'venomous' and that his newspaper is a 'daily drip of venom.' " Id. In addition, the plaintiff editor complained about the defendant newspaper's cartoon "in which he [was] depicted with a cuckoo springing from his forehead." Id.

The court, holding that the statements were opinion and not actionable, stated that "the balance between a right of action for defamation and the right of editorial

freedom is struck with greater deference to the freedom of the editorial privilege." Id., 485. Similarly, the court in *National Rifle Assn.* v. *Dayton Newspapers, Inc.*, 555 F. Sup. 1299, 1311 (S.D. Ohio 1983), held that an editorial that stated that the plaintiff " 'happily encourages murders and robberies' " was protected opinion." The United States Supreme Court, in interpreting its decision in *Letter Carriers* v. *Austin*, 418 U.S. 264, 284–86, 94 S. Ct. 2770, 41 L. Ed. 2d 745 (1974), opined that the "use of the word 'traitor' in literary definition of a union 'scab' [is] not basis for a defamation action under federal labor law since [it was] used 'in a loose, figurative sense' and was 'merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members.' " *Milkovich* v. *Lorain Journal Co.*, supra, 497 U.S. 17.

In light of the foregoing, it seems clear to this court that the statements "contributions to slush funds," "part of the fix," "secret, illegal and corrupt deals," "payoffs," "blatant coverup attempt" and "maneuvers with political and corrupt implications" are examples of rhetorical hyperbole of which "[n]o reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging [the plaintiff] with the commission of a criminal offense." *Greenbelt Cooperative Publishing Assn.* v. *Bresler*, supra, 398 U.S. 14.

The other statements (four and seven) are in news articles, not in editorials. Even so, the terms "racket" and "backroom deals" found in statements four and seven are not actionable as libel. "[W]e cannot say that the statement that the plaintiff was engaged in 'back room deals' was proven by clear and convincing evidence to have been made with actual malice. The jury did not find a subsequent statement that the plaintiff was involved in 'back room maneuvering' to be libelous.

The two terms, however, have nearly identical implications and could be used interchangeably in a sentence without altering its meaning. '[T]he First Amendment cautions courts against intruding too closely into questions of editorial judgment, such as the choice of specific words.' *Janklow* v. *Newsweek, Inc.*, 788 F.2d 1300, 1304 (8th Cir.), cert. denied, 479 U.S. 883, 107 S. Ct. 272, 93 L. Ed. 2d 249 (1986)." *Woodcock* v. *Journal Publishing Co.*, supra, 230 Conn. 540–41.

In *Woodcock* v. *Journal Publishing Co.*, supra, 230 Conn. 541, which dealt with a public person, our Supreme Court held that "[w]e conclude that the term 'back room deals' was one rational interpretation of the situation as contemplated by [the plaintiff] . . . ."

The news article containing statement six[3] is also not actionable and may not be considered libelous "as a matter of law." Unlike the statement that, "[Milkovich] lied at the hearing after . . . having given his solemn oath to tell the truth"; (internal quotation marks omitted) *Milkovich* v. *Lorain Journal Co.*, supra, 497 U.S. 21; the statement that "[i]t looks like a payoff . . . I don't know if it's a payoff," is "the sort of loose, figurative, or hyperbolic language which would negate the impression that the writer was seriously  maintaining that [the plaintiff] committed the crime of [bribery]." Id.

The statement, a direct quote from Powell, one of the Journal employees, is found at the end of an article which discusses the ethics commission's decision to postpone their investigation of the plaintiff's approval. Considering the position of the statement, as well as the tone of the statement, this is a statement that is "recognizable by the ordinary reasonable person as opinion and not as a statement of fact. . . . In applying

---

[3] "It looks like a payoff," Powell said. "I don't know if it's a payoff." Article thirty-four–article, "Ethics Commission puts off Oldefield probe," January 18, 1989.

this test, however, [t]he court must consider all the words used, not merely a particular phrase or sentence. In addition, the court *must give weight to cautionary terms used by the person publishing the statement.*" (Citation omitted; emphasis added; internal quotation marks omitted.) *Goodrich* v. *Waterbury Republican-American, Inc.,* supra, 188 Conn. 121.

The inclusion of the words, "I don't know" in the statement is significant as it suggests a cautionary tone that would tend to demonstrate an opinion rather than a fact. "Recovery was denied in *Loeb* v. *New Times Communications Corporation,* 497 F. Supp. 85 (S.D.N.Y. 1980), where the court specifically found that '[t]he authors' clear intent was to portray an overwhelmingly negative picture of Loeb by presenting purported examples of his ridiculous idiosyncrasies and prejudices, shady political maneuverings, and dishonest reporting practices. . . . In spite of the 'suggestive context,' the article was constitutionally protected because the 'defendants have reported the facts accurately and carefully, avoiding the defamatory conclusion which Loeb claims they intended the reader to draw.' " (Citation omitted.) *Strada* v. *Connecticut Newspapers, Inc.,* 193 Conn. 313, 323–24, 477 A.2d 1005 (1994).

"While the defendants' articles adopted a somewhat adversarial stance toward the plaintiff, '[a]n adversarial stance is certainly not indicative of actual malice under the circumstances where, as here, the reporter conducted a detailed investigation' . . . and adopted one rational interpretation of an ambiguous situation." (Citation omitted.) *Woodcock* v. *Journal Publishing Co.,* supra, 230 Conn. 546. While the plaintiff, as a private person, need only show "a negligent misstatement of fact"; *Miles* v. *Perry,* supra, 11 Conn. App. 588; he has failed to demonstrate that there is a material issue of

fact as to whether the defendants have negligently mis-stated the facts underlying any of the alleged defama-tory statements. Similarly, it is clear that the mixed fact and opinion statements qualify as privileged.

"Summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact . . . a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evi-dence disclosing the existence of such an issue. . . . It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court [in support of a motion for summary judgment]." (Citation omitted; internal quotation marks omitted.) *Home Ins. Co.* v. *Aetna Life & Casualty Co.*, 235 Conn. 185, 202–203, 663 A.2d 1001 (1995).

The court finds, as a matter of law, that the statements made by the defendants are not libelous. The plaintiff has not established the existence of a material fact that is in issue. Accordingly, the defendants' motion for summary judgment is granted.