[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This matter was tried to the court on July 5-6, 2001. The issues which were tried related only to the defendant's amended counterclaim (#111.25). Pursuant to a briefing schedule, the parties submitted post-trial memoranda of law, the last of which was filed on August 20, 2001. The court now issues this memorandum of decision. CT Page 13634
 I PROCEDURAL BACKGROUND
The plaintiff, John R. Arigno, commenced this action by complaint, dated May 23, 1996, containing two counts, alleging defamation, including libel per se, and alleging negligent infliction of emotional distress. (See Exh. 10.) According to the complaint, Arigno claimed that the defendant, Ian Murzin, defamed him by falsely claiming that Arigno, a Connecticut State Trooper, had beaten Murzin[1] while Murzin was in State Police custody, at Troop K in Colchester, Connecticut, on May 28, 1994. Annexed to the complaint was a copy of Murzin's then-attorney's letter to the Colchester Town Clerk, dated June 27, 1994, which stated that Murzin had been "beaten badly" while in custody, and that, among other members of the State Police, Arigno "may be sued. . . ." Also annexed was a copy of an article from The Hartford Courant, dated June 29, 1994, which stated that Murzin alleged that he had been assaulted by Arigno.[2] The sheriff's return reflects that the complaint was served on May 24, 1996.
Also on May 24, 1996, Murzin, along with two others, including his brother, Stephen Murzin. filed a complaint in the United States District Court for the District of Connecticut, in six counts, alleging violations of their civil rights, including unlawful arrest, illegal detention, malicious prosecution, deprivation of liberty, excessive and unreasonable force, negligence, trespass, assault and battery, as well as other allegations (the "federal complaint"). (See Exh. 11.) Named as defendants therein were various individuals, including members of the Connecticut State Police, but not Arigno. By then, as reflected below, Murzin no longer believed that Arigno had assaulted him. In the federal complaint, Murzin alleged that, on May 21, 1994, he and Stephen Murzin witnessed an assault by Town of Colchester constables on Phillip Inkel. (See Exh. 11, federal complaint, ¶ 30.) After speaking with his father. Richard Murzin, who was then a detective with the Hartford Police Department, Stephen Murzin subsequently telephoned Troop K's barracks to file a complaint with the State Police. (See Exh. 11, federal complaint, ¶ 31.)
Murzin also alleged that on May 28, 1994, two of the defendants in the federal action arrested Stephen Murzin and himself and took them to the Troop K barracks. (See Exh. 11, federal complaint, ¶ 32.) There, Stephen Murzin was assaulted, primarily by Town of Colchester constables. (See Exh. 11, federal complaint, ¶¶ 35-36.) Murzin alleged also, that he, Murzin, was punched in the eye by Connecticut State Trooper Lawrence Slyman, causing Murzin to strike a wall and cut his back. (See Exh. 11, federal complaint, ¶ 38) Murzin alleged also that CT Page 13635 he and his family were forced to move from Colchester as a result of harassment and threats by Colchester constables. (See Exh. 11, federal complaint, ¶ 41.)
As noted above, the trial of the matter before this court concerned only Murzin's amended counterclaim, dated March 17, 1997 (#111.25). In the first count, Murzin alleges that Arigno commenced this action "without probable cause and primarily to hinder and harass defendant Murzin for having instituted a complaint against plaintiff Arigno's friends and colleagues, that resulted in discipline and possible monetary damages." (See Amended Counterclaim, first count, ¶ 8.) Murzin also alleges that this action was begun by Arigno "for the additional improper purpose of intimidating and chilling the rights of citizens, including defendant Murzin. who report unconstitutional or otherwise improper behavior by members of the State Police." (See Amended Counterclaim, first count, ¶ 9.) As a result, Murzin claims that Arigno has abused the civil court process.
In the second count of the amended counterclaim, Murzin alleges that, on July 11, 1996, Arigno drove into a car wash where Murzin was employed, while Arigno was in uniform and armed with a handgun, and "threatened to kill defendant Murzin. by stating, `You're dead.'" (Amended Counterclaim, second count, ¶ 12.) Murzin alleges that, as a result of this act, Arigno is liable to him for the intentional or reckless infliction of emotional distress. In the third count, Murzin incorporates the allegations of the second count, and alleges that Arigno is liable for the negligent infliction of emotional distress.
Murzin filed a motion for summary judgment, dated July 21, 1997 (#114.25), which was addressed to Arigno's complaint.[3] By memorandum of decision, dated February 6, 1998 (Exh. 8), the court (Stengel, J.), found that Murzin's written statements made to the Connecticut State Police, in which he alleged that Arigno was responsible for beating Murzin, were absolutely privileged, since they were made for the purpose of having an investigation commenced concerning his allegations of police misconduct. Summary judgment was granted as to those communications only. Summary judgment was not granted concerning allegations made by Arigno concerning "the conduct of [Murzin's] former attorney, which included interviews with the news media." Exhibit 8, memorandum of decision, p. 4.
On July 5, 2001, the first day of trial, Arigno filed a withdrawal of his complaint. On that date he also filed his answer to the counterclaim, in which he denied its salient allegations.
 II CT Page 13636 FACTS
The court credits the following evidence and finds the following facts, except as noted. It is undisputed that Arigno did not assault Murzin on May 28, 1994. However, his involvement with the events of that date and Murzin's initial allegations charging him with police brutality relate directly to whether or not Arigno engaged in abuse of process.
In his initial statement to the State Police following his release from custody on May 28, 1994, Murzin, who was then age seventeen, alleged that police officers came to his home soon after he and his brother arrived there themselves, at around 2:00 a.m. on that date, following their attendance at a party where they engaged in "hanging out, drinking. etc." (Exh. 1, Statement of Murzin, dated May 28, 1994.) According to this statement, Murzin and his brother were then informed that they were going to be arrested for breach of peace. They were transported to Troop K. There, an officer named Thomas began arguing with Stephen Murzin. in part about the prior incident involving police and Phillip Inkel, which Stephen Murzin had witnessed, and which allegedly involved an officer punching and kicking Inkel while he was handcuffed. (See Exh. 4, Statement of Murzin, dated June 6, 1994; see also Exhibit B, Hartford Courant article, dated July 27, 1994.). Murzin saw his brother taken down the stairs and then heard banging and screaming. An unnamed officer then came into the room where Murzin was "and punched me in the right eye and grabbed me on my neck and slammed me up against the wall and was choking me." Murzin was subsequently finger-printed and he and his brother were released at about 5:30 a.m. (See Exh. 1, Statement of Murzin, dated May 28, 1994.) He and his brother then sought medical treatment for injuries they had received in police custody. (See Exh. 4, Statement of Murzin, dated June 6, 1994.)
Murzin gave an additional statement to the State Police two days later, on May 30, 1994. In this statement, Murzin claimed that the "trooper" who hit him was the same trooper who fingerprinted him. Murzin claimed that he was able to see this trooper's name tag when the trooper came back to where Murzin was in order to do some paperwork. "That is when I was able to see his name tag. His name was Arigno." (See Exh. 3, Statement of Murzin, dated May 30., 1994.) Murzin named Arigno again as the trooper who had assaulted him in his June 6, 1994 statement. (See Exh. 4.)[4]
As the State Police conducted an investigation into the Murzins' complaints (see Exhibit E, Notification of Internal Affairs Investigation, dated June 10, 1994), their then-attorney, F. Mac Buckley, issued his letter of June 27, 1994, to the Town of Colchester, CT Page 13637 advising the municipality of their intent to sue the Town and several of its employees, and that Arigno and other troopers "may be sued. . . ." In the same letter, Buckley stated that he was in communication with the Internal Affairs Division of the Connecticut State Police, the Governor, the Chief State's Attorney, the State's Attorney for the Judicial District of New London, the United States Attorney, the Federal Bureau of Investigation, and the Naval Intelligence Service (since Stephen Murzin was at that time a member of the U.S. Marines). One day later, June 28, 1994, Buckley held a press conference to discuss the Murzins' allegations. The Hartford Courant published an extensive article on the day after that, June 29, 1994, entitled, "2 accuse police of beating at barracks." The second paragraph states, "[s]tate police are investigating the accusations of Stephen Murzin, 19, and Ian Murzin, 17, who allege they were punched, kicked and choked by Colchester Officer Charles Thomas and Trooper John Arigno." (See Exh. 10, Exhibit B to Arigno's complaint.)
The article also states that an outline of the Murzins' complaint is contained in an intent-to-sue notice filed by Buckley, clearly referring to his letter of June 27, 1994. The article contains a detailed recitation of the events as recalled by the Murzins, "drawn from sworn affidavits from the Murzins. other witnesses, and from the intent-to-sue notice," and including the statement, "Trooper Arigno came into [Murzin's] cell and told him to shut up before punching him in the right side of his head, choking him and slamming him against the cell wall, Ian Murzin said." (Exh. 10, Exhibit B to Arigno's complaint.)
In addition, the press conference was the subject of television news coverage. The court viewed a videotape, Exhibit O, of a news broadcast, from WFSB, Channel 3, which was on the air either on June 28 or 29, 1994. The broadcast included the printed words "Accused of Brutality" and "Trooper John Argino" [sic].[5]
In his trial testimony, Murzin acknowledged that when he met with Buckley prior to June 27, 1994, he was not completely sure that the trooper who had hit him was Arigno. (See Transcript of proceedings, July 5, 2001, p. 55, 11. 4-7; p. 56, 11. 3-6.)
At trial, Murzin testified that Buckley spoke to the media on Murzin's behalf. He also claimed that he did not specifically authorize Buckley to or discuss with him that Buckley was going to name Arigno in the intent to sue letter. The court does not credit this testimony. Murzin acknowledged that he and Buckley had discussed the "game plan" before Buckley issued his June 27, 1994 letter and held the press conference, which Murzin knew about in advance and attended. At that time, Murzin believed that Arigno had assaulted him. CT Page 13638
One month later, The Hartford Courant published another article, on July 27, 1994, with the headline, "Different trooper focus of probe," and a sub-headline, which stated, "Identity in beating case at issue." (See Exh. B) The lead paragraph stated, "[t]he focus of a state police probe of brutality allegations has shifted from. Trooper John Arigno because one of the alleged victims picked another trooper from a photo lineup, police and the complainants' attorney said Tuesday." (See Exh. B.) The article noted that Murzin had mistaken Arigno for Trooper Lawrence Slyman. At trial, Murzin stated that when he identified (from the photographs) the officer who had assaulted him, he was not informed that that person was not Arigno. At that point in time, Arigno had not been advised of the results of the Internal Affairs investigation.
The report of the Internal Affairs Unit of the State Police, prepared by Sergeant Bruce Whitaker, issued after its investigation, "completely exonerated" Arigno. (See Exh. 9, Internal Affairs Investigation, IA 94-042, Book One of Four, Conclusion, p. 4.) It also noted that, while Arigno was processing Murzin on May 28, 1994, Murzin "told him that someone had come inside the holding cell and slammed him against the wall and told him to shut up. Trooper Arigno said he didn't bring this to Sergeant Chappell's attention because he thought that everyone was all worked up." (Exh. 9, Summary, p. 5.) In contrast to the exoneration of Arigno, the report recommended that Trooper Slyman, and Colchester Officers Thomas and Nardella face disciplinary charges, including conduct unbecoming an officer, cowardice, use of force, incompetence, inefficiency, and neglect of duty. (See Exh. 9, Conclusion, p. 4.)
The report indicates that Arigno said that he had seen Murzin rubbing his neck and face, as well as grabbing his own neck with both hands and squeezing it. (See Exh. 9, Summary, p. 5.) At trial, Sergeant Whitaker testified that if there had been any indication that the injuries received by Murzin while in custody had been self-inflicted, he would have included that in the report. The report does not contain such a statement. Photographs of Murzin show bruising to his face and neck. (See Exhs. 15A, 15B, and 15C.)
Arigno told the Internal Affairs investigators that he was not concerned about being falsely accused. At trial, he explained that his comment was made before the incident was publicized in the media. At that point, he was concerned about the outcome. He sought professional help, in a single session, from a counseling program which is made available to State Police officers.
In late December, 1994, Arigno received the results of the State's Attorney's investigation. No criminal charges were brought against CT Page 13639 Arigno. (See Exhibit D.) At about the same time, he also learned that the Internal Affairs investigation had exonerated him. Subsequently, Arigno was interviewed by the Federal Bureau of Investigation concerning allegations of civil rights violations.
The Hartford Courant reported the filing of the federal complaint, in an article published on June 5, 1996. (See Exh. K.) This article also notes that Murzin had misidentified Arigno as his assailant and indicated that Arigno was suing Murzin for defamation. According to the article, "Murzin said he was confused because Slyman had been apparently wearing a sweater with Arigno's name tag on it. Ian Murzin and his former attorney, F. Mac Buckley, accused Arigno of brutality in newspapers and on television news reports." At trial, Murzin stated that he never thought that the troopers had switched sweaters. In his trial testimony, Stephen Murzin identified himself as having mentioned to the media the idea of a sweater with someone else's name-tag on it.[6]
The parties stipulated (see Exhibit 17) that Attorney William Bloss, if he had testified at trial, would have testified that he represented Inkel in the federal action. According to the stipulation, the Murzins settled their claims in that litigation and withdrew from it. Murzin was a necessary witness who testified on Inkel's behalf at the trial of that case. Following the trial, the federal court ruled in Inkel's favor and awarded damages. (See Exh. 17.)
At the time of the 1994 incidents, Arigno had been a trooper for approximately one year and four months. At trial, Arigno confirmed that he had read the newspaper articles, and was aware of the press conference which had been held by Buckley. He also watched the television report about the press conference. In response to interrogatories, Arigno stated that he was damaged as a result of the incidents alleged in his complaint by having been subjected to an internal affairs investigation, as well as investigations by the State's Attorney for New London County and the Federal Bureau of Investigation. He incurred no expenses as a result.
At the time Arigno commenced this action, he was aware that some of his co-workers, including Slyman, had been disciplined as a result of the incidents reported by the Murzins. He did not talk to Nardella, Thomas, Slyman, or others who had been involved about his intention to commence this action.
The court credits Arigno's testimony, in which he stated that he commenced this action because he had been falsely accused of a serious crime, which bore directly on his reputation as a police officer in the eyes of the public. When he read the Hartford Courant article of June 29, 1994, he was concerned that, even if the truth eventually came out, CT Page 13640 thousands of people would never know the truth and there would be a mark against his name forever. He was concerned because he was still working on developing a reputation as a trooper.
Murzin was a tentative, unconvincing witness. The court does not credit Murzin's testimony in which he alleged that Arigno threatened him at the car wash in July, 1996. To the contrary, no credible evidence was presented to establish that the threat was made. The court credits Arigno's denial. At trial, Murzin acknowledged that previously, approximately one year earlier, in 1995, well after the events of May and June, 1994, Arigno had picked up Murzin and driven him to Troop K in Colchester and nothing untoward occurred. At that time, Arigno had been advised by Troop K that Murzin was listed as a missing person. Another trooper then drove Murzin from Troop K to Hartford.
In addition, the July, 1996 incident was thoroughly investigated by the Hartford Police Department. Sergeant (now Lieutenant) Kornbrath of that department prepared a report of his investigation, which included interviews of several people, such as other individuals employed at the car wash, and other police officers who had their vehicles washed at around the same time Arigno had his washed there. (See Exh. 7, incident report) In the course of that investigation, Arigno's attorney communicated Arigno's denial of the threat allegation to Kornbrath. Kornbrath concluded that there was insufficient probable cause to proceed any further. In addition, two Hartford police officers, who had their cars washed on the day in question at the car wash, at around the same time Arigno was there, testified at trial. Neither noticed anything unusual occur.
 IV DISCUSSION A. Abuse of Process
As noted above, in the first count of his complaint, Murzin claims that Arigno commenced this action primarily to hinder and harass Murzin for having instituted a complaint against Arigno's friends and colleagues. In addition, he claims that Arigno had an additional improper purpose, that of intimidating and chilling the right of citizens, including Murzin, who report unconstitutional or otherwise improper behavior by the State Police. Murzin alleges that, in so doing, Arigno has abused the civil court process.
"An action for abuse of process lies against any person using a legal process against another in an improper manner or to accomplish a purpose CT Page 13641 for which it was not designed. . . . Because the tort arises out of the accomplishment of a result that could not be achieved by the proper and successful use of process, the Restatement Second (1977) of Torts, § 682, emphasizes that the gravamen of the action for abuse of process is the use of "a legal process . . . against another primarily to accomplish a purpose for which it is not designed. . . ." (Emphasis added.) Comment b to § 682 explains that the addition of "primarily' is meant to exclude liability when the process is used for the purpose for which it is intended, but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant." (Internal quotation marks and citations omitted.) Mozzochi v. Beck, 204 Conn. 490, 494-97, 529 A.2d 171
(1987).
"A party does not abuse legal process merely by filing a lawsuit. To allege a viable cause of action for abuse of process, a claimant must point to specific misconduct intended to cause specific injury outside of the normal contemplation of private litigation." (Internal quotation marks omitted.) Norse Systems, Inc. v. Tingley Systems, Inc.,49 Conn. App. 582, 601, 715 A.2d 807 (1998). To succeed on an abuse of process claim, a plaintiff need not establish that the proceeding was begun without probable cause. See, Lewis Truck Trailer, Inc. v.Jandrean, 11 Conn. App. 168, 171, 526 A.2d 532 (1987).
Murzin argues that Arigno's primary motive for his suit against him was revenge against Murzin for being involved in a complaint which led to the resignation, discipline, and/or discharge of Arigno's co-workers. (See Murzin's Post-Trial Memorandum, p. 19; Murzin's Response To Defendant's Post Trial Memorandum, pp. 2-3 ("Murzin's Reply")) No third party witness or evidence was offered to directly substantiate this theory. In effect, Murzin asks the court to draw an inference from the circumstances in order to prove his revenge theory. "A permissible inference rests upon premises of fact; conjecture does not." Malvicini v. Stratfield MotorHotel, Inc., 206 Conn. 439, 446, 538 A.2d 690 (1988).
To support the theory, Murzin argues that Arigno's claims against him were baseless. For example, Murzin argues that Arigno's reputation was not damaged, that he incurred no medical expenses, and he suffered no emotional distress as a result of Murzin's misidentification of Arigno as the person who assaulted him. (See Murzin's Post-Trial Memorandum, p. 4.)
"Under Connecticut law, when a party is the victim of libel per se, he is presumed to be injured and is entitled to general damages without proof of actual damages." Battista v. United Illuminating Co.,10 Conn. App. 486, 491, 523 A.2d 1356, cert. denied, 204 Conn. 803,525 A.2d 1352 (1987). "When the defamatory words are actionable per se, CT Page 13642 the law conclusively presumes the existence of injury to the plaintiff's reputation. He is required neither to plead nor to prove it) but may recover general damages. (Internal quotation marks omitted.) Id., 492. Two of the general classes of libel per se are "(1) libels charging crimes and (2) libels which injure a man in his profession and calling." (Internal quotation marks omitted.) Id. To fall within the first category, the "[m]odern view of this requirement is that the crime be a chargeable offense which is punishable by imprisonment." Id., 493.
Here, it is evident that in claiming that Arigno assaulted him, Murzin was charging Arigno with the commission of a crime which was punishable by imprisonment. See Conn. Gen. Stat. § 53a-61. In addition, since it is highly improper for a police officer to commit an assault, a false claim that he did so injures him in his profession and calling. Thus. under Connecticut law, Arigno's defamation claim against Murzin was one of libel per se, entitling him. if proved, to recover general damages, even in the absence of actual damages.[7]
To support his revenge theory, Murzin also advances the arguments that his statements were absolutely privileged and that he never authorized Buckley to charge Arigno with assaulting him. (See Murzin's Post-Trial Memorandum, pp. 8-10, 14-18.) As noted above, the court (Stengel, J.) granted summary judgment concerning Murzin's statements to the Connecticut State Police, and denied summary judgment concerning Buckley's statements to the media. (See Exhibit 8.)
"Under the first amendment to the United States constitution, a public official, . . . in order to recover damages for a defamatory "falsehood relating to his or her official conduct, must prove that the statement was made with actual malice. . . . Actual malice requires that the statement, when made, be made with actual knowledge that it was false or with reckless disregard of whether it was false. . . . Moreover, a public official must prove actual malice by clear and convincing evidence in order to prevail in a defamation action." (Citations and footnote omitted.) Woodcock v. Journal Publishing Co., 230 Conn. 525, 535,646 A.2d 92 (1994). A police officer, such as Arigno, is a public official for the purposes of analysis under the law of defamation.Moriarty v. Lippe, 162 Conn. 371, 378, 294 A.2d 326 (1972).
Based on the record presented at trial, there was no reason to believe that Murzin's allegations against Arigno were made with actual knowledge that they were false. However, there was probable cause to believe that Murzin's allegations against Arigno were made with reckless disregard of whether they were false. "[T]he legal idea of probable cause is a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution. prudence and CT Page 13643 judgment, under the circumstances, in entertaining it. . . . Probable cause is the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of" (Internal quotation marks and citations omitted.) DeLaurentis v. New Haven, 220 Conn. 225,256, 597 A.2d 807 (1991). Probable cause "does not require the accuracy presented by hindsight. Inherent in the concept of probable cause is that the factual basis . . . may be inaccurate." State v. Glenn, 251 Conn. 567,576, 740 A.2d 856 (1999).
While not dispositive. a failure to undertake an adequate investigation may be considered by the court in this context. See Woodcock v. JournalPublishing Co., supra, 230 Conn. 544-545. The 1994 incident at Troop K happened relatively quickly and involved a small number of people. There is evidence in the record reflecting that Murzin did not know who his assailant was on the date of the incident and that it was Murzin's brother who suggested to him the name of the officer involved in assaulting Murzin. (See Murzin's Post-Trial Memorandum, p. 2.) There is no evidence to indicate that Arigno went into hiding after the incident at Troop K, thereby preventing proper identification. The record indicates that he remained on duty there in the days that followed.
At trial, Murzin confirmed that, when he met with Buckley prior to June 27, 1994 (the date of Buckley's letter), he was not sure that it was Arigno who had assaulted him. Thus, there was evidence "to permit the conclusion that [Murzin] in fact entertained serious doubts as to the truth of his publication." (Internal quotation marks omitted.) Woodcockv. Journal Publishing Co., supra, 230 Conn. 546.
As noted above, the court does not credit Murzin's testimony that he did not authorize Buckley to make statements to the media about Arigno. At the least, those statements were made with apparent authority. A client may be vicariously liable for defamatory statements made by his attorney if such statements were apparently authorized by the client. SeeGlucksman v. Walters, 38 Conn. App. 140, 144-145, cert. denied,235 Conn. 914, 665 A.2d 608 (1995).
While the statements made by Buckley in his letter of June 27, 1994 were privileged, see Judge Stengel's ruling on the motion for summary judgment (Exhibit 8), Murzin's Post-Trial Memorandum, page 18, is incorrect in stating "nowhere is it suggested that Buckley did anything more than read the charges" in his comments to the media. To the contrary, as reflected in Exhibit 10, Arigno's complaint, first count, paragraph 9, Arigno alleged that, on television, Buckley "stated and/or was credited with stating, `they should not be police officers . . . they retlect very badly on the system and brother police officers . . . they CT Page 13644 should be fired and then jailed for their actions.'" These statements are reflected, almost verbatim, in Exhibit O, the videotape of the news report. They went well beyond reading the charges.
Likewise, the court is unpersuaded by Murzin's argument that, by suing Murzin, who was seventeen years old at the time of the 1994 incidents, and by not suing the print and television media, Buckley, or Stephen or Richard Murzin, Arigno demonstrated that his true motive in the suit was revenge. (See Murzin's Post-Trial Memorandum. pp. 18-19; Murzin's Reply. p. 1-2).[8] Connecticut law does not require a "shotgun approach,"Willow Springs Condominium Association, Inc. v. Seventh BRT DevelopmentCorp., 245 Conn. 1, 21, 717 A.2d 77 (1998), to litigation to avoid a charge of abuse of process. The suit was brought against Murzin, the alleged victim, who had named Arigno as his assailant, to further clear Arigno's name. As noted above, Connecticut law permits the recovery of general or nominal damages in such circumstances.
Murzin also contends that he has shown that Arigno's suit was "a paradigmatic `SLAPP-suit', i.e. an `intimidation' suit, brought for the purpose of chilling public criticism of police action." (See Murzin's Post-Trial Memorandum, p. 3.) "SLAPP" stands for strategic lawsuit against public participation. See, Field v. Kearns, 43 Conn. App. 265,275-276, 682 A.2d 148, cert. denied, 239 Conn. 942, 684 A.2d 711 (1996). "The distinctive elements of a SLAPP suit are (1) a civil complaint (2) filed against a nongovernment individual (3) because of their communications to government bodies (4) that involves a substantive issue of some public concern. . . . The purpose of a SLAPP suit is to punish and intimidate citizens who petition state agencies and have the ultimate effect of "chilling' any such action." (Citation omitted.) Id., 276.
Recently, in Zeller v. Consolini, Superior Court, judicial district of Litchfleld at Litchfield, No. 060356 (Feb. 17, 1999, DiPentima, J.) (24 CLR 151), affirmed, 59 Conn. App. 545, 758 A.2d 376 (2000), the trial court analogized the SLAPP suit concept to that of the federal Noerr-Pennington doctrine as it applies to sham anti-trust proceedings. There, it was noted that "the sham exception is defined by our U.S. Supreme Court as follows:
 First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under Noerr, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court CT Page 13645 examine the litigant's subjective motivation.
(Footnote omitted.) Professional Real Estate Inv. v. Columbia PicturesInc., 508 U.S. 49, 60 (1993)."
As noted above, this court has determined that Arigno's suit against Murzin was not objectively baseless. Arigno's suit was not commenced to punish or intimidate Murzin or to chill the exercise of the right to petition government for the redress of grievances. It was not a SLAPP suit.
Under the United States Constitution, certain of the guarantees of the Bill of Rights are "fundamental safeguards of liberty." Gideon v.Wainwright, 372 U.S. 335, 341, 83 S.Ct. 792, 9 L.E.2d 799 (1963). Included among these is the right to petition for the redress of grievances. See id. As our Appellate Court has noted, embedded in thisFirst Amendment right "is entitlement to seek recompense from the courts." Lombardi Rest Home, Inc. v. Richter, 63 Conn. App. 646, 653, ___ A.2d ___ (2001).
Rather than engaging in an abuse of process, Arigno's pursuit of his claims was an exercise of his fundamental constitutional right of access to the courts for the redress of his grievance. Thus, Murzin has not proved his claim, in his first count, that Arigno's pursuit of his suit against Murzin was an abuse of process. Judgment may enter in favor of Arigno and against Murzin on Murzin's abuse of process claim.
 B. Infliction of Emotional Distress
In the second and third counts of his counterclaim, Murzin alleges that Arigno is liable to him for intentional and negligent infliction of emotional distress, based on the alleged incident at the car wash in 1996. As noted above, he claims that, on that occasion, Arigno threatened his life.
Our Supreme Court recently reiterated the elements which a plaintiff must prove in order to establish a claim for the intentional infliction of emotional distress. In Appleton v. Board of Education of Stonington,254 Conn. 205, 210, 757 A.2d 1059 (2000), the court restated the four necessary elements: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe. . . . Id., 210. CT Page 13646
"Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id., 210-211. "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, `Outrageous!' . . . Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." (Citation omitted; internal quotation marks omitted.) Id., 211.
Earlier, in Parsons v. United Technologies Corp., 243 Conn. 66, 88,700 A.2d 655 (1997), the court reiterated the elements which must be proved to sustain a claim for the negligent infliction of emotional distress. A plaintiff must show "that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that distress, if it were caused, might result in illness or bodily harm." (Internal quotation marks omitted.) Id. In Montimeri v.Southern New England Telephone Co., 175 Conn. 337, 345, 398 A.2d 1180
(1978), the court stated that "recovery for unintentionally-caused emotional distress does not depend on proof of either an ensuing physical injury or a risk of harm from physical impact. Nevertheless, we recognize that the protection the law accords to the interest in one's peace of mind . . . must be limited so as not to open up a wide vista of litigation in the field of bad manners, where relatively minor annoyances had better be dealt with by instruments of social control other than the law." (Internal quotation marks and citation omitted.)[9]
Without citation to authority, Murzin asks the court, in this "civil context," to draw "an inference of a guilty conscience" from Arigno's communication of his denial of making the threat by way of his attorney rather through being interviewed by the investigating officer, then sergeant Kornbrath of the Hartford Police. (See Murzin's Post-Trial Memorandum, p. 13; Murzin's Reply, p. 4.) Our Supreme Court has cautioned against "mechanically" drawing inferences of guilt based on the exercise of one's legal rights. See State v. Jones, 234 Conn. 324, 356-359,662 A.2d 1199 (1995). Without question, Arigno had the right to remain silent in response to Murzin's allegation of the threat. See Miranda v.Arizona, 384 U.S. 436, 476, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Instead, he communicated a denial. An inference of guilt is unwarranted.
The court agrees that a threat of "you're dead" by Arigno, a uniformed police officer, would have been outrageous if it had been made. As set forth above, at pages 10-11, based in large part on its evaluation of the parties' respective credibility, the court finds that Murzin did not prove CT Page 13647 that Arigno made the claimed statement or otherwise threatened him. Accordingly, judgment may enter in favor of Arigno and against Murzin on counts two and three, concerning Murzin's emotional distress claims.
 IV CONCLUSION
For the foregoing reasons, after trial, judgment may enter in favor of Arigno and against Murzin on each of Murzin's counterclaims. It is so ordered.
BY THE COURT
ROBERT B. SHAPIRO JUDGE OF THE SUPERIOR COURT